# RIVERA v. MINNICH

No. 86–98.   Argued March 25, 1987—Decided June 25, 1987

STEVENS, J., delivered the opinion of the Court, in which REHNQUIST, C. J., and WHITE, MARSHALL, BLACKMUN, POWELL, and SCALIA, JJ., joined.   O'CONNOR, J., filed an opinion concurring in the judgment, *post*, p. 582.   BRENNAN, J., filed a dissenting opinion, *post*, p. 583.

*William Watt Campbell* argued the cause for appellant. With him on the brief was *James R. Adams.*

*Mary Louise Barton* argued the cause and filed a brief for appellee.*

JUSTICE STEVENS delivered the opinion of the Court.

The Pennsylvania statute governing proceedings brought against a defendant to establish his paternity of a child born out of wedlock specifies that the "burden of proof shall be by a preponderance of the evidence."[1] This appeal presents the question whether a determination of paternity by that evidentiary standard complies with the Due Process Clause of the Fourteenth Amendment. We agree with the Supreme Court of Pennsylvania's conclusion that applying the preponderance standard to this determination is constitutionally permissible.

---

*Briefs of *amici curiae* urging affirmance were filed for the State of California et al. by *John K. Van de Kamp,* Attorney General of California, *Steve White,* Chief Assistant Attorney General, *Jay Bloom,* Supervising Deputy Attorney General, *M. Howard Wayne,* Deputy Attorney General, *John S. Higgins, Jr., Joseph I. Lieberman,* Attorney General of Connecticut, *Jim Jones,* Attorney General of Idaho, *Neil F. Hartigan,* Attorney General of Illinois, *Frank J. Kelley,* Attorney General of Michigan, *Brian McKay,* Attorney General of Nevada, *Roger A. Tellinghuisen,* Attorney General of South Dakota, and *W. J. Michael Cody,* Attorney General of Tennessee; and for the State of Oregon by *Dave Frohnmayer,* Attorney General, *William F. Gary,* Deputy Attorney General, *Virginia L. Linder,* Solicitor General, *Michael D. Reynolds,* Assistant Solicitor General, and *Robert M. Atkinson,* Assistant Attorney General.

[1] Pennsylvania Stat. Ann., Tit. 42, § 6704(g) (Purdon 1982):

*"Trial of Paternity—*Where the paternity of a child born out of wedlock is disputed, the determination of paternity shall be made by the court without a jury unless either party demands trial by jury. The trial, whether or not a trial by jury is demanded, shall be a civil trial and there shall be no right to a criminal trial on the issue of paternity. *The burden of proof shall be by a preponderance of the evidence."* (Emphasis supplied.)

The statute was repealed on October 30, 1985; its successor also provides that the burden of proof in a paternity action "shall be by a preponderance of the evidence." 23 Pa. Cons. Stat. § 4343(a) (1985).

# I

On May 28, 1983, appellee Jean Marie Minnich, an unmarried woman, gave birth to Cory Michael Minnich. Three weeks later, appellee filed a complaint for child support in the Common Pleas Court of Lancaster County, Pennsylvania, against appellant Gregory Rivera, alleging that he was the father of her son. In advance of trial appellant requested the court to rule that the statutory burden of proof of paternity violated the Due Process Clause of the Fourteenth Amendment and to instruct the jury that paternity must be established by clear and convincing evidence. The trial judge denied the motion. Applying the preponderance standard, the jury unanimously found that appellant is the father of the child. On appellant's post-trial motions, the trial judge reconsidered his ruling on the burden of proof issue and granted appellant's motion for a new trial. Appellee appealed directly to the Pennsylvania Supreme Court, which held that the statute is constitutional and reinstated the jury's verdict. 509 Pa. 588, 506 A. 2d 879 (1986).

The State Supreme Court noted that the standard was entitled to the presumption that legislative enactments are valid, and is the same as that approved by a majority of the jurisdictions that regard paternity suits as civil proceedings. Then, after reviewing the respective interests of the putative father, the mother, and the child,[2] as well as "the interest of

---

[2] "The person alleged to be father has a legitimate interest in not being declared the father of a child he had no hand in bringing into the world. It is important to him that he not be required to provide support and direct financial assistance to one not his child. There is a legitimate concern on his part with not having a stranger declared his legal heir thereby giving that stranger potential interests, inter alia, in his estate, and Social Security Benefits. He has an interest in not being responsible for the health, welfare and education of a child not his own.

"The child born out of wedlock, on the other hand, has an interest in knowing his father and in having two parents to provide and care for him. The child's concerns include a known belonging to a certain line of descent

the Commonwealth in seeing that fathers support their children who are born out of wedlock so that those children do not become public charges," the court concluded that the preponderance standard is one that "does not unduly risk the erroneous deprivation of any of them."[3]   The Chief Justice of that court dissented.   Relying on our holding in *Santosky* v. *Kramer*, 455 U. S. 745 (1982), that the Constitution requires clear and convincing evidence before the State may terminate the parental relationship, he reasoned that the same degree of proof should be required to create the relationship.[4]   We noted probable jurisdiction, 479 U. S. 960 (1986), and now affirm.

## II

The preponderance of the evidence standard that the Pennsylvania Legislature has prescribed for paternity cases is the standard that is applied most frequently in litigation between private parties in every State.[5]   More specifically, it is the

---

with knowledge of any benefits or detriments inheritable from that line. Further, the child is entitled to financial assistance from each parent able to provide such support.

"The mother has an interest in receiving from the child's natural father help, financial and otherwise, in raising and caring for the child born out of wedlock.   She has an interest in seeing that her child has two responsible parents."   509 Pa., at 593–594, 506 A. 2d, at 882.

[3] *Id.*, at 596–597, 506 A. 2d, at 883.   Earlier the court had described the public interest more fully:

"The Commonwealth has an interest in its infant citizens having two parents to provide and care for them.   There is a legitimate interest in not furnishing financial assistance for children who have a father capable of support.   The Commonwealth is concerned in having a father responsible for a child born out of wedlock.   This not only tends to reduce the welfare burden by keeping minor children, who have a financially able parent, off the rolls, but it also provides an identifiable father from whom potential recovery may be had of welfare payments which are paid to support the child born out of wedlock."   *Id.*, at 594, 506 A. 2d, at 882.

[4] See *id.*, at 600, 506 A. 2d, at 885.

[5] "[T]he typical civil case involv[es] a monetary dispute between private parties.   Since society has a minimal concern with the outcome of such pri-

same standard that is applied in paternity litigation in the majority of American jurisdictions that regard such proceedings as civil in nature.[6]   A legislative judgment that is not only consistent with the "dominant opinion" throughout the country but is also in accord with "the traditions of our people and our law," see *Lochner* v. *New York,* 198 U. S. 45, 76 (1905) (Holmes, J., dissenting), is entitled to a powerful presumption of validity when it is challenged under the Due Process Clause of the Fourteenth Amendment.

The converse of this proposition is that a principal reason for any constitutionally mandated departure from the preponderance standard has been the adoption of a more exacting burden of proof by the majority of jurisdictions.   In each of the three cases in which we have held that a standard of proof prescribed by a state legislature was unconstitutional, our judgment was consistent with the standard imposed by most jurisdictions.   Thus, in explaining our conclusion that proof of a criminal charge beyond a reasonable doubt is constitutionally required, we stated:

"Although virtually unanimous adherence to the reasonable-doubt standard in common-law jurisdictions may not conclusively establish it as a requirement of due process, such adherence does 'reflect a profound judg-

---

vate suits, plaintiff's burden of proof is a mere preponderance of the evidence.   The litigants thus share the risk of error in roughly equal fashion." *Addington* v. *Texas,* 441 U. S. 418, 423 (1979).   See also E. Cleary, Mc-Cormick on Evidence 956 (3d ed. 1984) (preponderance standard applies to "the general run of issues in civil cases").

[6]See 10 Am. Jur. 2d, Bastards 837, 922 (1983); National Conference of State Legislatures, In the Best Interest of the Child: A Guide to State Child Support and Paternity Laws 102–103 (1982).   A few States apply a more stringent standard of proof to a civil paternity action.   See, *e. g., In re Wayne County Dept. of Social Services* v. *Williams,* 63 N. Y. 2d 658, 660, 468 N. E. 2d 705 (1984); *E. E.* v. *F. F.,* 106 App. Div. 2d 694, 483 N. Y. S. 2d 748 (1984) (clear and convincing evidence); Va. Code § 20–61.1 (Supp. 1986); *Jones* v. *Robinson,* 229 Va. 276, 287, 329 S. E. 2d 794, 800 (1985) (proof beyond a reasonable doubt).

ment about the way in which law should be enforced and justice administered.' *Duncan* v. *Louisiana,* 391 U. S. 145, 155 (1968)." *In re Winship,* 397 U. S. 358, 361–362 (1970).

Similarly, in *Addington* v. *Texas,* 441 U. S. 418 (1979), our rejection of Texas' argument that a preponderance standard of proof was sufficient in a civil proceeding to commit an individual to a state mental hospital involuntarily was supported by the fact that a majority of the States had chosen to apply either a clear and convincing standard, *id.,* at 431–432, nn. 6, 7, and 8, or the even more demanding criminal law standard, *id.,* at 430–431, and n. 5. And in *Santosky* v. *Kramer,* which presented the question whether New York could extinguish a pre-existing parent-child relationship without requiring greater factual certainty than a fair preponderance of the evidence, we began our analysis by noting that 38 jurisdictions required a higher standard of proof in proceedings to terminate parental rights. 455 U. S., at 749–750.

Appellant's principal argument is that the standard of proof required by our holding in *Santosky* to terminate the parent-child relationship is also constitutionally required to create it. This view of *Santosky* rests on the tacit assumption of an equivalence between the State's imposition of the legal obligations accompanying a biological relationship between parent and child and the State's termination of a fully existing parent-child relationship. We are unable to accept this assumption. The collective judgment of the many state legislatures which adhere to a preponderance standard for paternity proceedings rests on legitimate and significant distinctions between termination and paternity proceedings.

First, there is an important difference between the ultimate results of a judgment in the two proceedings. Resolving the question whether there is a causal connection between an alleged physical act of a putative father and the subsequent birth of the plaintiff's child sufficient to impose financial liability on the father will not trammel any pre-

existing rights; the putative father has no legitimate right and certainly no liberty interest in avoiding financial obligations to his natural child that are validly imposed by state law. In the typical contested paternity proceeding, the defendant's nonadmission of paternity represents a disavowal of any interest in providing the training, nurture, and loving protection that are at the heart of the parental relationship protected by the Constitution. See *Lehr* v. *Robertson*, 463 U. S. 248, 261 (1983).[7] Rather, the primary interest of the defendant is in avoiding the serious economic consequences that flow from a court order that establishes paternity and its correlative obligation to provide support for the child. In contrast, in a termination proceeding the State is seeking to destroy permanently all legal recognition of the parental relationship. In *Santosky*, we described the parent's desire for, and right to, the companionship, care, and custody of his or her children as "an interest far more precious than any property right." 455 U. S., at 758–759. The State's determination that the relationship between a parent and his or her child ought to be stripped of legal recognition abrogates many aspects of this precious interest. The difference between the two types of proceedings is thus a difference that is directly related to the degree of proof that is appropriately required. For, as we have said in explanation of the need for clear and convincing evidence in certain proceedings, "rights once confirmed should not be lightly revoked." *Schneiderman* v. *United States*, 320 U. S. 118, 125 (1943).

Second, there is an important distinction between the parties' relationship to each other in the two proceedings. As is

---

[7] "When an unwed father demonstrates a full commitment to the responsibilities of parenthood by 'com[ing] forward to participate in the rearing of his child,' *Caban* [v. *Mohammed*, 441 U. S. 380, 392 (1979)], his interest in personal contact with his child acquires substantial protection under the Due Process Clause. At that point it may be said that he 'act[s] as a father toward his children.' *Id.*, at 389, n. 7. But the mere existence of a biological link does not merit equivalent constitutional protection. The actions of judges neither create nor sever genetic bonds." 463 U. S., at 261.

true of the other types of proceedings in which the Court has concluded that the Constitution demands a higher standard of proof than a mere preponderance of the evidence, the contestants in a termination proceeding are the State and an individual. Because the State has superior resources, see *Santosky*, 455 U. S., at 763, and because an adverse ruling in a criminal, civil commitment, or termination proceeding has especially severe consequences for the individuals affected, it is appropriate for society to impose upon itself a disproportionate share of the risk of error in such proceedings. See *In re Winship*, 397 U. S., at 370–372 (Harlan, J., concurring); *Addington*, 441 U. S., at 427; *Santosky*, 455 U. S., at 766. Unlike those proceedings, in a paternity suit the principal adversaries are the mother and the putative father, each of whom has an extremely important, but nevertheless relatively equal, interest in the outcome. Each would suffer in a similar way the consequences of an adverse ruling; thus, it is appropriate that each share roughly equally the risk of an inaccurate factual determination. Nor does the child's interest in the proceeding favor placing a disproportionate share of the risk of error on either party. Surely, from the child's point of view, a lower standard of proof increases the possibility of an erroneous determination that the defendant is his or her father, while a higher standard of proof increases the risk of a mistaken finding that the defendant is not his or her true father and thus may not be required to assume responsibility for his or her support. The equipoise of the private interests that are at stake in a paternity proceeding supports the conclusion that the standard of proof normally applied in private litigation is also appropriate for these cases.[8]

---

[8] Unlike the State Supreme Court, we place no reliance on the State's interest in avoiding financial responsibility for children born out of wedlock. If it were relevant, the State's financial interest in the outcome of the case would weigh in favor of imposing a disproportionate share of the risk of error upon it by requiring a higher standard of proof. In our view,

Finally, there is an important difference in the finality of judgment in favor of the defendant in a termination proceeding and in a paternity proceeding. As we pointed out in *Santosky*, "natural parents have no 'double jeopardy' defense" against the State's repeated efforts to terminate parental rights. 455 U. S., at 764. If the State initially fails to win termination, as New York did in that case, see *id.*, at 751, n. 4, it always can try once again as family ·circumstances change or as it gathers more or better evidence. "[E]ven when the parents have attained the level of fitness required by the State, they have no similar means by which they can forestall future termination efforts." *Id.*, at 764. The imposition of a higher standard of proof protects the parents, and to some degree the child, from renewed efforts to sever their familial ties. In contrast, a paternity suit terminates with the entry of a final judgment that bars repeated litigation of the same issue under normal principles of civil litigation. There is no "striking asymmetry in [the parties'] litigation options." *Ibid.*

The judgment of the Supreme Court of Pennsylvania is therefore

*Affirmed.*

JUSTICE O'CONNOR, concurring in the judgment.

I believe that the judgment of the Pennsylvania Supreme Court should be affirmed for the reasons set forth by JUSTICE REHNQUIST in dissent in *Santosky* v. *Kramer*, 455 U. S. 745, 770–791 (1982). "Both theory and the precedents of this Court teach us solicitude for state interests, particularly in the field of family and family-property arrangements." *United States* v. *Yazell*, 382 U. S. 341, 352 (1966). Particu-

---

however, the State's legitimate interest is in the fair and impartial adjudication of all civil disputes, including paternity proceedings. This interest is served by the State's independent judiciary, which presumably resolves these disputes unaffected by the State's interest in minimizing its welfare expenditures.

larly in light of that special solicitude, I cannot find that the flexible concept of due process, *Santosky* v. *Kramer, supra,* at 774–776 (REHNQUIST, J., dissenting), bars Pennsylvania from providing that the litigants to a civil paternity suit are to bear the risk of factual error in roughly equal fashion. I do not find it necessary to this conclusion to rely upon the fact that the majority of American jurisdictions apply the same rule as Pennsylvania does. Cf. *ante,* at 577–578. Nor do I agree that the differences between termination and paternity proceedings are substantial enough to justify the different conclusion reached in *Santosky.* Accordingly, I concur in the Court's judgment but not its opinion.

JUSTICE BRENNAN, dissenting.

I cannot agree with the Court that a determination of paternity is no more significant than the resolution of "'a monetary dispute between private parties.'" *Ante,* at 577–578, n. 5, quoting *Addington* v. *Texas,* 441 U. S. 418, 423 (1979). What is at stake for a defendant in such a proceeding is not merely the prospect of a discrete payment in satisfaction of a limited obligation. Rather, it is the imposition of a life-long relationship with significant financial, legal, and moral dimensions.

Financially, a paternity determination results in ongoing, open-ended support responsibility. A parent is responsible for supporting a child at least until the child is 18, see, *e. g.,* 23 Pa. Cons. Stat. § 4321(2) (1985), and perhaps longer. § 4321(3). The father cannot be certain of the amount of support that will be necessary, for this will depend on the needs of the particular child over the years. § 4322. See also Uniform Marriage and Divorce Act, 9A U. L. A. § 309 (1979 and Supp. 1987). If his child receives any form of public assistance, all the father's real and personal property are deemed available to the State for reimbursement. Pa. Stat. Ann., Tit. 62, § 1974 (1968 and Supp. 1987). The financial commitment imposed upon a losing defendant in a pater-

nity suit is thus far more onerous and unpredictable than the liability borne by the loser in a typical civil suit.

The obligation created by a determination of paternity is enforced by significant legal sanctions. Failure to comply with a support obligation may result in the attachment of income, 23 Pa. Cons. Stat. § 4348 (1985), and a 10% penalty may be imposed for any amount in arrears for more than 30 days if the failure to pay is deemed willful. § 4348(c). In addition, a father's state and federal income tax refunds may be confiscated to pay alleged arrearages. 42 U. S. C. § 664 (1982 ed., Supp. III); 23 Pa. Cons. Stat. § 4307 (1985). Furthermore, failure to satisfy the support obligation may result in incarceration. A delinquent father may be declared in contempt of court and imprisoned for up to six months, § 4345, and may also be found guilty of a misdemeanor punishable by imprisonment for up to two years. 18 Pa. Cons. Stat. §§ 4304, 1104 (1982). A paternity determination therefore establishes a legal duty whose assumption exposes the father to the potential loss of both property and liberty.

"Apart from the putative father's pecuniary interest in avoiding a substantial support obligation and liberty interest threatened by the possible sanctions for noncompliance, at issue is the creation of a parent-child relationship." *Little* v. *Streater*, 452 U. S. 1, 13 (1981). The judgment that a defendant is the father of a particular child is the pronouncement of more than mere financial responsibility. It is also a declaration that a defendant assumes a cultural role with distinct moral expectations. Most of us see parenthood as a lifelong status whose responsibilities flow from a wellspring far more profound than legal decree. Some men may find no emotional resonance in fatherhood. Many, however, will come to see themselves far differently, and will necessarily expand the boundaries of their moral sensibility to encompass the child that has been found to be their own. The establishment of a parental relationship may at the outset have fewer emotional consequences than the termination of one. It has,

however, the potential to set in motion a process of engagement that is powerful and cumulative, and whose duration spans a lifetime. In this respect, a paternity determination is far more akin to the proceeding involved in *Santosky* v. *Kramer*, 455 U. S. 745 (1982), than to a suit for breach of contract.[1]

Finally, the losing defendant in a paternity suit is subject to characterization by others as a father who sought to shirk responsibility for his actions. See, *e. g.*, *County of Hennepin* v. *Brinkman*, 378 N. W. 2d 790, 794, (Minn. 1985) ("'[T]he social stigma resulting from an adjudication of paternity cannot be ignored'") (citation omitted); *Tennessee Dept. of Human Services* v. *Vaughn*, 595 S. W. 2d 62, 67 (Tenn. 1980) (losing defendant in paternity proceeding "branded as the bearer of a bastard child"); *Commonwealth* v. *Jacobs*, 220 Pa. Super. 31, 37, 279 A. 2d 251, 254 (1971) ("Inevitably, paternity proceedings, whether labeled civil or criminal, result in a certain community stigma following a judicial acknowledgment of the parents' impropriety"). He is seen as a parent apparently impervious to the moral demands of that role, who must instead be coerced by law to fulfill his obligation. Regardless of whether a satisfying parent-child relationship ultimately develops, the father will be seen as a person whose initial participation in it was involuntary. By contrast, the losing party in a civil suit is rarely the target of such social opprobrium.[2]

---

[1] Its consequences are also at least as serious as those resulting from other proceedings in which Pennsylvania demands proof by clear and convincing evidence, such as proof of a change of domicile, *McKenna* v. *McKenna*, 282 Pa. Super. 45, 422 A. 2d 668 (1980); reformation of contract on grounds of mistake, *Boyertown National Bank* v. *Hartman*, 147 Pa. 558, 23 A. 842 (1892); proof of adverse possession, *Stevenson* v. *Stein*, 412 Pa. 478, 195 A. 2d 268 (1963); and a claim for wages for personal services rendered to a decedent, *Mooney's Estate*, 328 Pa. 273, 194 A. 893 (1937).

[2] Of course, a child also has an interest in not being stigmatized as illegitimate. As we have stressed, however, an illegitimate child cannot be held responsible for his or her status. See *Trimble* v. *Gordon*, 430 U. S.

A paternity proceeding thus implicates significant property and liberty interests of the defendant. These can be protected without significantly burdening the interests of the mother, the child, or the State. Modern blood-grouping tests, such as the human leukocyte antigen (HLA) test used in this case, provide an extremely reliable means of determining paternity in most cases. See generally L. Sussman, Paternity Testing By Blood Grouping (2d ed. 1976). The probability of paternity in this case, for instance, was calculated at 94.6%, Brief for Appellee 2, a level of certainty achieved quite frequently through the use of such tests. See, *e. g.*, *Jones* v. *Robinson*, 229 Va. 276, 282, 329 S. E. 2d 794, 798 (1985) (probability of paternity calculated at 99.97% and "at least" 99% in two consolidated appeals).

It is likely that the requirement that paternity be proved by clear and convincing evidence would make a practical difference only in cases in which blood test results were not introduced as evidence. In such cases, what I wrote over 35 years ago is still true: "in the field of contested paternity . . . the truth is so often obscured because social pressures create a conspiracy of silence or, worse, induce deliberate falsity." *Cortese* v. *Cortese*, 10 N. J. Super. 152, 156, 76 A. 2d 717, 719 (1950). Recognition of this fact, as well as of the gravity of imposing a parental relationship upon a defendant, should lead us to require a more demanding standard of proof than a mere preponderance of the evidence.

I respectfully dissent.

---

762 (1977). By contrast, the stigma that attaches to the father of such a child reflects a judgment regarding moral culpability. In addition, as I discuss in text this page, I believe that the child's interest in legitimation would not be significantly burdened by the employment of a "clear and convincing" standard.