971 P.2d 332

**STATE of Idaho DEPARTMENT OF HEALTH AND WELFARE, on Behalf of STATE OF OREGON, Plaintiff–Respondent,**

v.

**Daniel P. CONLEY, Defendant–Appellant.**

**No. 24337.**

Court of Appeals of Idaho.

Jan. 8, 1999.

Daniel P. Conley, Boise, pro se appellant.

Alan G. Lance, Attorney General; Kirsten A. Ocker, Deputy Attorney General, Boise, for respondent. Kirsten A. Ocker argued.

SCHWARTZMAN, Judge

Daniel Conley appeals the district court's affirmance of the magistrate's findings of fact and conclusions of law and judgment and order of filiation declaring Conley to be the natural father of J.A.C. and ordering Conley to pay child support. For the reasons stated below, we affirm.

## I.

## FACTUAL AND PROCEDURAL BACKGROUND

On August 4, 1995, the Department of Health and Welfare (Department) filed a complaint on behalf of the state of Oregon against Daniel Conley, alleging that he was the natural father of J.A.C. who was born in Oregon on February 8, 1994, to Vicki L. Brooks. The child was conceived in Idaho and the mother lived in Oregon. The Department requested that the court issue an order establishing Conley's paternity and the payment of child support. In addition, the Department requested that the Bureau of Vital Statistics in Oregon be ordered to issue a new birth certificate identifying Conley as J.A.C.'s father.

On August 25 the Department filed an admission of service, stipulation and order for DNA testing signed by Conley. In the stipulation, upon the advice of counsel, Conley voluntarily agreed to submit to DNA testing. On November 14, 1995, the Department submitted the results of paternity testing to the court which indicated there was a 99.63 percent probability that Conley was the father. At some point thereafter, Conley dismissed his attorney.

Acting *pro se*, Conley next filed the following motions: (1) a "preliminary notice of personal appearance and motion for extension of time and/or dismissal of case with cause," (2) a motion to quash the waiver and stipulation with cause, and (3) his answer to the Department's complaint.[1] The court dismissed Conley's "Motion to Quash Waiver and Stipulation and DNA Evidence with Cause," finding that Conley had missed the deadline for challenging the testing procedures or DNA analysis and that he was otherwise bound by his own stipulation.

Subsequently, Conley requested that the court appoint counsel to represent him on the basis of his indigency and inability to defend himself. Conley's request was supported by an affidavit of poverty and his federal tax return from 1995 in which he listed $2,263 as his adjusted gross income. Although the court expressed concerns that Conley may be voluntarily unemployed, it found that Conley had earned virtually no income for the past two years and was therefore unable to afford to pay for his own attorney. With respect to whether Conley would be entitled to court appointed counsel due to his indigency, the court concluded that there was no authority, statutory or constitutional, requiring the appointment of counsel in paternity actions and thus denied Conley's motion.

A bench trial to determine paternity was held on June 20, 1996. Thereafter, the court issued findings of fact and conclusions of law, ruling that the Department established by a preponderance of the evidence that Conley is J.A.C.'s biological father and awarding child support pursuant to the Idaho Child Support Guidelines in the amount of $174 per month. The court determined the amount of child support by imputing income of $1,100 per month to Conley and imputing income of $737 per month to Brooks.[2] The court entered a judgment and order of filiation, and further ordered that the child support award take effect as of August 1995, the month in which the complaint was filed.

Conley then filed an appeal with the district court. On October 29, 1997, the district court issued a memorandum decision affirming the magistrate's judgment and order of filiation. Conley again appeals.

---

1. Of Conley's more colorful claims, he argues that he is the victim of "fatal attraction" and malicious entrapment by Ms. Brooks. He states: "Whether I am or am not the father of her baby, I deny responsibility on the grounds of being tricked by a woman who saw someone with whom she developed a 'fatal attraction' and used sexual aggressiveness and lies in order to get pregnant and entrap a husband (meal ticket)."

2. The court found that Conley was voluntarily underemployed in 1994 and 1995, and voluntarily unemployed in 1996. The court further found that Conley had a demonstrated ability to work as an avionics mechanic earning a minimum of $6 to $8 per hour, and that he was capable of earning *at least* $1,100 per month. The court also found Brooks to be voluntarily unemployed and imputed income to her on the basis of full time, minimum wage employment.

## II.

## ANALYSIS

### A. The Court Had Personal Jurisdiction Over Conley

■ Conley asserts that the court lacked personal jurisdiction over him, as defined in I.C. § 7–1004. In addition, Conley argues that the court could not exercise jurisdiction over him pursuant to the Uniform Interstate Family Support Act (UIFSA) because the UIFSA only applies to families. Since he did not marry Brooks, Conley argues that none of the statutes relied upon by the court apply to him because they all refer to familial or other similar relationships that he does not share with either Brooks or J.A.C.

Idaho Code § 7–1004 defines the bases for the exercise of personal jurisdiction over *nonresidents* in proceedings to establish, enforce, or modify a support order or to determine parentage. Because Conley is a resident of this state, his reliance on this section is misplaced. *See also* I.C. § 5–514(f).

### B. The Court Had Subject Matter Jurisdiction

■ Conley asserts that the trial court did not have subject matter jurisdiction over this case, arguing that pursuant to Idaho Rules of Civil Procedure 82(c)(2), a magistrate only has jurisdiction to hear cases involving custody of minors incident to divorce, adoption or termination of parental rights. Because he never married Brooks, Conley claims that this case does not fall within the ambit of I.R.C.P. 82(c)(2) as it does not involve divorce, adoption or the termination of parental rights. In addition, Conley asserts that the UIFSA does not apply to him because he is a single party "outside of subject matter of marriage, family, domestic relations and divorce."

The UIFSA, I.C. § 7–1001, *et seq.*, specifically grants to the courts of this state the jurisdiction to hear cases involving paternity and child support. Pursuant to I.R.C.P. 82(c), the district court is permitted to delegate the authority to hear paternity and child support cases to attorney magistrates. Thus, the magistrate court had subject matter jurisdiction to determine paternity, enter an order of filiation and order child support.

### C. The Trial Court Properly Denied Conley's Request For Court–Appointed Counsel

Conley argues that he was entitled to the appointment of counsel. He asserts that case law requires the appointment of counsel where a loss of liberty is possible, where there is a risk of error in the absence of counsel, or where the complexity of the case requires the assistance of counsel. Conley asserts that because all of these conditions exist in his case, he is entitled to court-appointed counsel.

We acknowledge that many jurisdictions either permit or require the appointment of counsel in paternity proceedings. *See* 41 Am.Jur.2d *Illegitimate Children* § 46 (1995); Kristine Cordier Karnezis, Annotation, *Right of Indigent Defendant in Paternity Suit to Have Assistance of Counsel at State Expense,* 4 A.L.R.4th 363 (1981 & Supp.1998). Of the eighteen jurisdictions that have adopted the Uniform Parentage Act, only three did not adopt the *requirement* that an indigent defendant be appointed counsel. However, two of the three jurisdictions *permit* the appointment of counsel, at the court's discretion. Idaho is not one of the eighteen jurisdictions that has adopted the Uniform Parentage Act.

Nevertheless, in *Lassiter v. Department of Soc. Servs.,* 452 U.S. 18, 101 S.Ct. 2153, 68 L.Ed.2d 640 (1981), the United States Supreme Court held that an indigent defendant does not have a *per se* right to counsel in proceedings for the termination of parental rights. In reaching this conclusion, the Court adopted the balancing test set forth in *Mathews v. Eldridge,* 424 U.S. 319, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976), for determining whether a procedure provided is sufficient to satisfy constitutional due process when an individual's property or liberty is at stake. This determination requires a balancing of the following factors: (1) the private interest that will be affected by the official action; (2) the governmental interest, including the function involved and the fiscal and administrative burdens that the additional or substi-

tute procedural requirement would entail; and (3) the risk of erroneous deprivation of the private interest through the procedures used and the probable value of additional or substitute procedural safeguards. *Eldridge*, 424 U.S. at 335, 96 S.Ct. 893. These factors are then weighed against the presumption that there is a right to appointed counsel only where the indigent may lose his personal freedom if he is unsuccessful. *Id.* After engaging in this balancing test, the Court determined that the appointment of counsel in proceedings to terminate parental rights was best left to a case-by-case analysis and declined to adopt a *per se* rule requiring or precluding such appointment. Subsequently, the Court held that a putative father's interest in a paternity proceeding is not as substantial as a parent's interest in a termination proceeding. *See Rivera v. Minnich*, 483 U.S. 574, 107 S.Ct. 3001, 97 L.Ed.2d 473 (1987).

■■■ After applying the *Eldridge* test to paternity proceedings generally, and Conley's case specifically, we hold that no right to appointed counsel attaches in paternity proceedings for several reasons. First, the primary interest sought to be vindicated in paternity proceedings is financial. Conley has asserted no interest in establishing a parent-child relationship with J.A.C. but has merely sought to contest financial responsibility. A putative father has no legitimate right and certainly no liberty interest in avoiding the financial obligations to his natural child that are validly imposed by the state. *Rivera*, 483 U.S at 580, 107 S.Ct. 3001. His interest in a paternity proceeding in no way compares to the substantial interests implicated in a termination proceeding, a

proceeding in which the United States Supreme Court has declined to adopt a *per se* rule requiring appointed counsel. Second, the financial burden on the state in providing appointed counsel to all indigent individuals involved in paternity proceedings could be significant and is a determination properly left to the discretion of the legislature rather than this Court.[3] The state has a legitimate interest in limiting the cost of paternity actions to the public. Third, and finally, the absence of counsel in paternity proceedings is unlikely to result in erroneous determinations. A rebuttal presumption of paternity arises only when a genetic test result creates a probability of paternity of at least 98 percent. *See* I.C. § 7–1116(1). The presence of counsel to rebut this presumption would result in *de minimis* benefits, as the risk of erroneous determinations of paternity is already limited by highly accurate blood tests. Furthermore, I.C. § 7–1116(2) provides that the court may, upon reasonable request by a party, order that independent tests be conducted. Thus, the risk of error in paternity proceedings would not be affected in any meaningful way by the presence of counsel.

Weighing the balance of these factors against the presumption that an indigent is only entitled to counsel if he or she will suffer the risk of erroneous deprivation of rights, we conclude that due process does not require the appointment of counsel in paternity actions. This conclusion is consistent with the decisions of appellate courts in other jurisdictions that have similarly declined to adopt the Uniform Parentage Act.[4] Accordingly, we agree with the trial court's conclu-

---

**3.** We note that despite the U.S. Supreme Court's holding in *Lassiter*, the Idaho Legislature has required that indigent parents be appointed counsel in termination proceedings. *See* I.C. § 16–2009.

**4.** *See Burrell v. Arkansas Dept. of Human Servs.*, 41 Ark.App. 140, 850 S.W.2d 8 (Ark.App.1993) (holding that a defendant is not guaranteed the right to appointed counsel in paternity actions because the defendant's physical liberty is not in jeopardy); *Iowa ex rel. Hamilton v. Snodgrass*, 325 N.W.2d 740 (Iowa 1982) (holding that due process does not require the appointment of counsel in paternity actions); *Sheppard v. Mack*, 68 Ohio App.2d 95, 427 N.E.2d 522 (Ohio App.

1980) (no right to court-appointed counsel in paternity actions); *Oregon ex rel. Adult & Family Servs. Div. v. Stoutt*, 57 Or.App. 303, 644 P.2d 1132 (Or.App.1982) (declining to require the appointment of counsel in paternity actions where an attorney would have little affect on the outcome); *see also Nordgren v. Mitchell*, 716 F.2d 1335, 1339 (10th Cir.1983) (holding that there is generally no right to appointed counsel for indigents in paternity actions and counsel should only be appointed in unusual and complicated cases where the risk of error is high enough that the presumption against the right to appointed counsel is overcome).

sion that Conley was not entitled to court-appointed counsel.

## D. The Court Properly Admitted And Considered The Results Of Genetic Testing

Conley asserts a number of challenges to the trial courts admission and consideration of the DNA test results which demonstrate a 99.63 percent probability that Conley is J.A.C.'s father, only two of which warrant consideration on appeal. First, he argues that he signed the stipulation, waiver, and order on the advice of counsel and did not know he had the right to refuse. Second, Conley argues that he did not receive the results of the test until the day of trial, in violation of I.R.C.P. 6(c)(7) and I.C. § 7–1116, which require that such test results be served upon a defendant at least twenty-eight days before trial.

### 1. Waiver and stipulation

■ Despite Conley's current objections, he admits that he voluntarily signed the stipulation and waiver. He merely argues that he should not be held to the stipulation and waiver because he signed them only upon the advice of counsel. Idaho appellate courts have long held that civil litigants choose their attorneys and cannot avoid the consequences of their attorney's actions. *See Devault v. Steven L. Herndon, A Professional Ass'n,* 107 Idaho 1, 2, 684 P.2d 978, 979 (1984). An attorney may bind a client by stipulation respecting procedural or remedial matters as appear to be necessary to accomplish the purpose for which the attorney was hired, so long as the subject matter of the stipulation is within the scope of the attorney's implied authority. *In re Holt,* 102 Idaho 44, 47, 625 P.2d 398, 401 (1981); *Muncey v. Children's Home Finding & Aid Soc. of Lewiston,* 84 Idaho 147, 151, 369 P.2d 586, 588 (1962). Accordingly, a client who voluntarily enters into a stipulation upon the advice of counsel for genetic testing pursuant to I.C. § 7–1116 cannot escape the consequences of that stipulation and is bound by his signature.

### 2. Disclosure of paternity test results

■ Section 7–1116(1) of the Idaho Code and Rule 6(c)(7) of the Idaho Rules of Civil Procedure require that a defendant be served with results of the genetic testing at least twenty-eight days before trial. Conley claims that he did not receive the genetic test results until the day of trial. However, this claim is belied by the record, including Conley's own motion.

In Conley's motion to quash the waiver and stipulation, which he filed on December 20, 1995, he states: "It claims that the test was 99.63% positive." Additionally, in the "notice of filing paternity testing results," which was filed with the court on November 14, 1995, the Department certifies that a copy of the test result was mailed to Conley's attorney of record. These filings demonstrate that Conley received the results of the genetic testing well within the twenty-eight-day period before trial; in fact, Conley received the results at least six months before trial. Accordingly, Conley's assertion lacks merit.

## E. The Trial Court Did Not Err In Applying The Guidelines To Determine Conley's Support Obligation

Conley argues that for a number of reasons, the trial court's application of the Guidelines and award of child support were erroneous. Only two of his assertions merit discussion. First, Conley argues that the trial court improperly applied the Guidelines in determining his potential income and monthly child support obligation. Second, Conley argues that the trial court erred in requiring him to provide J.A.C.'s medical insurance.

■ At trial, Conley testified that he was unemployed but that he could probably earn $6 to $8 per hour in his profession as an avionics mechanic or, alternatively, that he could obtain employment in a field outside of his profession at this pay rate. Based on this testimony and statistics from the Idaho Department of Labor Research and Analysis Bureau, the trial court imputed income of $1,100 per month to Conley. This amounts to a little over $6 per hour on a full-time

basis. Although the court imputed $1,100 monthly income to Conley, it stated its belief that Conley was capable of earning more. The court also imputed full-time minimum wage employment income to Brooks, finding her to be voluntarily unemployed as well.

■ In determining whether a parent is voluntarily unemployed or underemployed and whether potential income should be imputed to that parent, the court must look to any or all of the following: employment potential and probable earnings level based on work history, occupational qualifications, and prevailing job opportunities and earnings levels in the community. *See* I.C.S.G. § 6(c)(1)(A).

Conley testified that the prevailing wage for an aircraft mechanic in the state of Idaho is about $8 per hour and acknowledged that the average wage for an aircraft mechanic in the state of Idaho is $13.24 per hour, with a low wage of $6 per hour.[5] He further testified that prior to 1994, he was permanently employed by Executive Avionics and Maintenance and since then, he had made efforts to obtain permanent employment, including "searching through the newspaper." He testified that when he does apply for jobs, he is told he is too qualified. When asked if he could obtain a $6 an hour job, Conley testified that although he could probably work any number of jobs for $6 an hour, he was currently being treated at the Veteran's Administration for anger aggression therapy and did not like working around people.

Given his skills and ability, the trial court's decision to impute $1,100 of monthly income to Conley is amply supported by the record.[6] We conclude that the court correctly applied the child support guidelines and properly determined Conley's child support obligation based upon his imputed income.

· Conley also challenges the order that he provide medical insurance for J.A.C. However-

er, the court ordered Conley to provide such insurance "if available to him through employment at a reasonable cost." The court then ordered that the insurance premium be divided between the parties in proportion to their guideline income, which was 60 percent to Conley and 40 percent to Brooks. If Conley obtains employment and has access to insurance at a reasonable cost, he will be required to obtain medical insurance for J.A.C. The court did not err in requiring Conley to provide insurance under these circumstances.

### F. Conley's Challenge To His Driver's License Suspension Is Not Properly Before This Court

■ Conley challenges the Department's order suspending his driver's license. Apparently, in the period after Conley filed this appeal with the district court, but prior to the court issuing its opinion, the Department ordered the suspension of Conley's driver's license. This issue was not before the magistrate court because the suspension did not occur until after the magistrate had entered its order and decree. Thus, when the district court issued its opinion, it did not address the propriety of the Department's order suspending Conley's driver's license. At oral argument, Conley informed this Court that he was in the process of appealing the suspension of his driver's license to the district court and that such appeal was pending. Because Conley's driver's license suspension is independent of this paternity action and is currently before the district court, the issue is not properly before this Court and we decline to address it.

### G. Other Issues On Appeal

Conley raises a host of additional claims that are unsupported by either law or fact, or otherwise not properly raised before this

---

**5.** We note that statistics from the Idaho Department of Labor indicate that the low wage for an aircraft mechanic in Idaho in 1995 was $6 per hour, while the median wage was $12.95 per hour and the average wage was $13.24 per hour. Conley later disputed the average wage of an avionics mechanic being as high as $13.24 per hour.

**6.** Conley also advised the trial court that he was not actively seeking employment as he was devoting all his time to defending this paternity action.

Court. Therefore, we decline to address them specifically other than to find them to be without merit for purposes of this appeal.[7]

## III.

### CONCLUSION

We affirm the magistrate's findings of fact and conclusions of law and judgment and order of filiation declaring Conley to be the natural father of J.A.C. and ordering Conley to pay child support.

Chief Judge PERRY and Judge Pro Tem BENGTSON, concur.

[7]. Conley's claims include, *inter alia*, the following: (1) he was denied the right to work, job opportunities and/or dismissed because of the state's decision to withhold income from his paychecks; (2) the state is depriving him of his property, the right to work, earn a living and support pursuant to I.C. §§ 18–7001, –7003, by withholding income from him; (3) he was denied due process because he was not given adequate notice of the time, date and place for a hearing regarding his driver's license suspension and he was denied a hearing pursuant to the Idaho's Administrative Procedure Act; (4) by suspending his driver's license, the state has deprived him of his constitutionally guaranteed right to travel and freedom of movement; (5) without a driver's license, he is denied the right to "travel, work, labor, to earn a living, maintenance and support," which has caused "extreme stress and emotional distress"; and (6) the Department has discriminated against men by "implying a marriage, family, household and divorce where none exists and discrimination between gender, thus prima facie evidence."