558 A.2d 548

**COMMONWEALTH of Pennsylvania ex rel. William M. COBURN**

v.

**Diane M. COBURN.**

**Appeal of William H. COBURN.**

Superior Court of Pennsylvania.

Argued Dec. 20, 1988.

Filed May 3, 1989.

296

Diane M. Zabowski, Collegeville, for appellant.

Leon H. Fox, Jr., Norristown, for appellee.

Before CIRILLO, President Judge, and BROSKY, McEWEN, DEL SOLE, MONTEMURO, BECK, TAMILIA, POPOVICH and JOHNSON, JJ.

TAMILIA, Judge:

Appellant William M. Coburn initiated this action by filing a petition for contempt of an agreed custody Order against appellee Diane M. Edinger, formally Diane Coburn, seeking to enforce his rights under the Order. After a hearing and in consideration of appellee's new matter claim that appellant is not the biological father of appellee's youngest daughter, the trial court entered an Order on April 20, 1987 directing appellee, the child, and the putative father to submit to blood tests for the purpose of establishing the paternity of the child—the Order did not direct appellant to submit to a blood test. Appellant appeals from this Order.

The parties were married on June 15, 1974 and divorced on August 2, 1979. Two children were born during their marriage: Jennifer Leah Coburn, born May 18, 1975, and Angie Lee Coburn, born August 7, 1976. Since their divorce, appellee has remarried to Ronald Edinger.

On October 15, 1979, the parties entered into an agreed custody Order whereby appellee retained physical custody of the children and appellant was permitted regular visitation consisting of alternating weekends from 12:00 p.m.

Saturday to 6:00 p.m. Sunday, with one week summer vacation and holiday visitation on an annually alternating basis from 10:00 a.m. to 6:00 p.m. for New Year's Day, Easter, Memorial Day, Fourth of July, Labor Day, and Thanksgiving and with Christmas Day visitation from 1:00 p.m. to 6:00 p.m. A contemporaneous Order for the payment of child support was also entered. Appellee's admissions in her answer to appellant's petition for contempt indicate that in December, 1982 the parties agreed to an informal modification of the visitation schedule, allowing appellant increased rights consisting of alternating weekends from 5:30 p.m. Friday to 6:00 p.m. Sunday with two consecutive weeks summer vacation and the same holiday visitation previously ordered. Both the custody arrangement and support Order were substantially complied with until February, 1987. In February, 1987, appellee told both children appellant was not the natural father of Angie Lee and she refused to allow appellant further visitation with Angie Lee, on the basis that he was not her biological father. In response, appellant filed a contempt petition on March 17, 1987, alleging appellee was in violation of the agreed custody Order.

A hearing on the contempt petition was scheduled on April 20, 1987, and on that date, appellee filed an answer and new matter averring appellant was not Angie Lee's biological father and requesting the court to order appellant to submit to a blood test to determine the paternity of Angie Lee. At the hearing, appellee presented the testimony of the putative father, Thomas Schwartz, Jr., who stated he was the biological father, indicated his willingness to accept the legal and financial responsibilities of paternity, and agreed to submit to blood testing. Appellee, on behalf of herself and Angie Lee, also consented to such testing, however, appellant refused. At the conclusion of the hearing, the trial court entered an Order, pursuant to 42 Pa.C.S. § 6133, directing that red cell typing and Human Leucocyte Antigen ("HLA") testing be performed on the putative father, appellee and child. This appeal followed. Requests for stay of the blood test Order were denied by both the

trial court and the Superior Court, and the blood tests were completed, indicating a 99.97 per cent probability that Schwartz is the biological father of Angie Lee. In light of these results, the trial court dismissed the petition for contempt on May 22, 1987, without holding further hearings.

A number of issues are presented by this appeal, not the least of which is its propriety. Complicating this issue is the fact that appellant's contempt proceeding has taken on the posture of a custody proceeding due to the new matter claim of paternity raised by appellee. Further, appellant did not raise prior to this appeal his substantive issue of whether appellee has waived or is precluded from raising any objection to appellant being Angie Lee's father under grounds of res judiciata, collateral estoppel and equitable estoppel.

■ In the past we have found interlocutory Orders concerning blood testing appealable, *Chrzanowski v. Chrzanowski*, 325 Pa.Super. 298, 303, n. 3, 472 A.2d 1128, 1130, n. 3 (1984); *Commonwealth ex rel. Hall v. Hall*, 215 Pa.Super. 24, 257 A.2d 269 (1969); *Commonwealth ex rel. Weston v. Weston*, 201 Pa.Super. 554, 193 A.2d 782 (1963), and we find the same circumstances call for allowance of this appeal. Additionally, under these circumstances we find appellant's failure to raise his issues of estoppel and res judicata before the trial court does not preclude his ability to present those claims on appeal. Appellant filed his petition for contempt on March 17, 1987 and did not receive appellee's answer until the day of the hearing on the petition. The answer was filed at 9:27 a.m. on the day of the hearing and was not accompanied by a certificate of service indicating if, or when, appellant was served with the answer. This supports appellant's contention that he received the answer minutes before the hearing. Pennsylvania Rule of Civil Procedure 1915.12, governing the procedure for contempt of a custody Order, specifically provides in subsection (c), "[n]o answer to the petition shall be required." The rule's explanatory note indicates that custo-

dy contempt pleadings are purposely kept to a minimum in order to insure a quick resolution of the matter: "Rule 1915.12 provides a streamlined contempt procedure.... The defendant is not required to answer the petition and he is given a period of at least seven days in which to defend." The rules neither require an answer to a contempt petition nor a response to new matter raised in an answer filed.

We find no merit to appellee's claims that appellant's issues are waived for failure to raise them in post-trial motions, because "exceptions are not required in a child custody case." *In re Custody of Frank,* 283 Pa.Super. 229, 233, 423 A.2d 1229, 1232 (1980); *see* Pa.R.C.P. 1915.10(b) ("No Motion for Post–Trial Relief may be filed to an order of custody, partial custody or visitation."). Appellant did raise his issues concerning estoppel and res judicata in his statement of matters complained of on appeal and the trial court addressed them in its Opinion.

The situation presented by this case poses more than one factual twist to the normal scenario involving a paternal blood test. Instead of having a putative father initiating a custody proceeding or a former spouse denying paternity in an effort to avoid paternal obligations, we are faced with a father of a ten year old girl trying to enforce his long held and used custody and visitation rights against his former spouse and mother of the child, who has raised a defense that the father is not the actual biological father of the child. The wisdom and motivations behind appellee's revelation to her children are certainly questionable. What is more apparent is the effects of her actions must be dealt with in a manner which, first and foremost, best serves the child's best interest and the parties' interests to whatever extent is possible.

The trial court ordered the blood tests on the basis of the putative father's testimony that he is the father and on authority of section 6133 of the Uniform Act on Blood Tests to Determine Paternity, 42 Pa.C.S. §§ 6131 *et seq.,*[1] which states:

1. Act of July 9, 1976, P.L. 586, No. 142, § 2, effective June 27, 1978.

## § 6133. Authority for test

In any matter subject to this subchapter in which paternity, parentage or identity of a child is a relevant fact, the court upon its own initiative or upon suggestion made by or on behalf of any person whose blood is involved may, or upon motion of any party to the action made at a time so as not to delay the proceedings unduly, shall order the mother, child and alleged father to submit to blood tests. If any party refuses to submit to such tests, the court may resolve the question of paternity, parentage or identity of a child against such party, or enforce its order if the rights of others and the interests of justice so require.

42 Pa.C.S. § 6133.[2] Under section 6133 the trial court has the authority to order tests if "paternity, parentage or identity of a child is a relevant fact." However, paternity is only a "relevant fact" when paternity has not been established either by consent or order in a prior proceeding. *Wachter v. Ascero*, 379 Pa.Super. 618, 550 A.2d 1019 (1988); *Manze v. Manze*, 362 Pa.Super. 153, 523 A.2d 821 (1987). Accordingly, although paternity is relevant in a custody dispute such as this one, Mrs. Coburn is collaterally estopped from raising any question concerning paternity because of the prior custody/support Orders which have determined paternity as a matter of law. Therefore, blood testing under the Act is inappropriate.

There is a strong presumption of legitimacy in Pennsylvania. *Manfredi Estate*, 399 Pa. 285, 289, 159 A.2d 697, 699 (1960); *Connell v. Connell*, 329 Pa.Super. 1, 6, 477 A.2d 872, 875 (1984); *Burston v. Dodson*, 257 Pa.Super. 1, 13, 390 A.2d 216, 222 (1978). In this case, the presumption is bolstered by the parties' actions. Appellee willfully accepted the agreed support and custody Orders entered into

**2.** Section 6132 of the Act, 42 Pa.C.S. § 6132, states the subchapter applies to all civil matters and certain enumerated criminal matters. *See In re Adoption of Young*, 469 Pa. 141, 149, 364 A.2d 1307, 1312–13 (1976), where our Supreme Court recognized paternity is a relevant fact in a termination of parental rights action, but held the mother was estopped from raising the question of paternity and, therefore, blood testing was inappropriate.

following the parties' divorce and under the doctrine of collateral estoppel she is precluded from denying appellant's paternity. In *Schultz v. Connelly*, 378 Pa.Super. 98, 548 A.2d 294 (1988), we applied the doctrine to deny a father's petition to vacate an agreed support Order:

> [A] plea of collateral estoppel is valid if, 1) the issue decided in the prior adjudication was identical with the one presented in the later action, 2) there was a final judgment on the merits, 3) the party against whom the plea is asserted was a party ... to the prior adjudication, and 4) the party against whom it is asserted has had a full and fair opportunity to litigate the issue in ... question in a prior action.

*Id.*, 378 Pa.Superior Ct. at 102, 548 A.2d at 296 (quoting *Day v. Volkswagenwerk Aktiengesellschaft*, 318 Pa.Super. 225, 237, 464 A.2d 1313, 1319 (1983); citations omitted).

Identity of issue was met when appellee agreed to the 1979 support and custody Orders, thus, acknowledging appellant was the father of the child. An Order for support necessarily determines the issue of paternity and absent an appeal taken directly from the Order or a showing of fraud, the issue of paternity is established as a matter of law and cannot be challenged by an aggrieved party in a subsequent proceeding. *Wachter, supra; Schultz, supra; Shindel v. Leedom*, 350 Pa.Super. 274, 504 A.2d 353 (1986). The same can be said for entry of a custody Order, *Seger v. Seger*, 377 Pa.Super. 391, 547 A.2d 424 (1988), which also demands a determination of paternity prior to entry when the basis of the claim is parental in nature. As we stated in *Seger:*

> If a father's conduct works an estoppel on his assertion of non-paternity in a support matter, there is no principle in law which would prevent the same application to a case, such as here, where the mother informs the father he is responsible for the pregnancy, marries him, assigns paternity to him on the birth certificate, permits him to support the child and assume the parental duties for years, and only upon separation repudiates his paternity.

*Id.,* 377 Pa.Superior Ct. at 397, 547 A.2d at 427. In *Seger,* the former-husband/father brought a contempt petition to enforce a prior custody Order and we reversed the trial court's determination that because the father was shown not to be the biological father, he had no legal standing to custody rights. We held in *Seger* that the mother was estopped to disprove the paternity of the father because of her past actions of openly accepting him as the father and his past support and acceptance of the child. Here, appellant's claim for custody has always been based on his status of father of both daughters and the prior actions of both parties support this.

By failing to appeal the 1979 Orders, the finality of the determination of paternity has been decided on the merits. Paternity is a circumstance that cannot change nor be used as a changed circumstance in a modification proceeding. *Schultz, supra; Chrzanowski, supra.* The third requirement of estoppel of identity of parties is readily met in this case because appellee was a willful party to the 1979 Orders.

Lastly, the voluntariness of the agreed Order, followed by an agreed modification of appellant's visitation rights, indicates appellee's decision not to litigate the issue of paternity in the prior proceeding incident to the parties' divorce. Appellee's failure to object to paternity at that time does not negate the full and fair opportunity to litigate that was present. Appellee has not and can not raise any claim to fraud in this matter.

From this we find appellee is estopped from raising the issue of appellant's paternity. Therefore, in this contempt proceeding between appellant and appellee paternity is not a "relevant fact" under 42 Pa.C.S. § 6133, because it cannot be placed into issue by either party. The trial court's decision to institute blood tests was inappropriate under these circumstances because paternity was not at issue at the contempt hearing. Only enforcement of the custody Order was at issue during the contempt proceeding. The testimony by the putative father, Schwartz, at the

hearing was inappropriate and did not justify a blood test in connection with that proceeding because he was not a party to the contempt petition. We point out that the putative father's testimony was weak and inconclusive with no detail as to opportunity or even reference to sexual intercourse; it was a simple affirmation that he is the biological father (N.T. 2/20/87, pp. 4–7). Because the putative father is not a party to this action, the blood test need not be ordered on his behalf as we found was necessary in *John M. v. Paula T.*, 377 Pa.Super. 72, 546 A.2d 1162 (1988) (action by putative father to enforce visitation rights and requesting blood tests to prove his paternity).[3] Even should Schwartz bring his own petition for custody and prove his paternity, this would have no effect on appellant's right to custody due to appellant's existing relationship which is beneficial to the best interest of the child.

In *Seger* we illustrated that the best interests of the child sometimes require that a non-biological parent or stepparent, who has nurtured the child and developed a loving relationship, must be given custody and/or visitation rights even though his relationship with the natural mother may have ended.[4] The mental well-being of the child dictates the necessity for the relationship to continue. No case for such a continuance of the relationship could be stronger than appellant's. Angie Lee was born during the marriage and three years prior to the divorce. Appellant enjoyed seven and one-half years of uninterrupted visitation and partial custody following the divorce. Therefore, for a period of ten and one-half years appellant developed, without any question of paternity, a relationship with his daughter. Such a relationship cannot be curtailed simply because of a finding that appellant is not in fact the natural father.

3. Since on its facts this case is totally dissimilar to *John M. v. Paula T.*, 377 Pa.Super. 72, 546 A.2d 1162 (1988), and the issue present in that case is not before us, we wish to make it clear we are not speaking with approbation of the panel decision in *Paula T.*

4. *See Burke v. Pope*, 366 Pa.Super. 488, 531 A.2d 782 (1987) (concerning the custodial rights of a third party non-parent); *Spells v. Spells*, 250 Pa.Super. 168, 378 A.2d 879 (1977) (concerning stepparent rights to child custody/visitation).

Appellant has assumed the relationship of father and has shown no intention to relinquish the responsibilities this entails. As in *Seger*, it cannot be in the best interests of the child to have this relationship cut off simply because there is no biological tie between them. Therefore, we find partial custody and visitation to be appropriate. In this era of artificial insemination, surrogate parenting and in-vitro fertilization, legal rights of a non-biological parent may become fixed by virtue of the parties' actions and the developmental relationship of the child with the parent. To permit one parent to revoke the parentage of the other parent, once those rights have been legally determined, in the absence of fraud, by invoking a blood test, invites chaos to the child's emotional well-being and legal status.

We reverse and remand to the trial court for entry of an Order consistent with this Opinion. In addition to determining whether appellee should be held in contempt and whether an Order directing compliance is necessary, we direct the trial court to examine appellant's March 17, 1987 petition for modification of visitation schedule, which was filed contemporaneously to the contempt petition by appellant to enforce the parties' informal agreed modification of the 1979 custody Order. Jurisdiction relinquished.

CIRILLO, President Judge, files a concurring statement.

BROSKY, J., files a concurring opinion.

CIRILLO, President Judge, concurring:

While I am in agreement with the majority's finding that the trial court improperly dismissed appellant's contempt petition on the basis of the blood test results, I write separately to note my concern with the majority's position that a blood test, instituted by one parent to revoke the parentage of another parent, even after those rights have been legally determined, necessarily "invites chaos to the child's emotional well-being and legal status." On the contrary, I can envision numerous instances where such a

test would provide crucial data for a child's well-being and continued mental and physical health.

Since Dr. Karl Landsteiner's discovery of the ABO blood groupings in 1901, medical science has progressively refined the data that can be obtained through blood analysis. While facilitating the first safe transfusions of blood, Dr. Landsteiner's discoveries also opened the door to genetic research. *See* Polesky and Lentz, *Parentage Testing: An Interface Between Medicine and Law*, 60 N.D.L.Rev. 727, 730 (1984). It was the application of noted geneticist Gregor Mendel's "inheritance factors," coupled with the advancement of modern biomedical research, which led to the institution of genetic counselling and screening to determine the chances of contracting certain diseases, or passing them on to one's offspring. *See* President's Commission for the Study of Ethical Problems in Medicine and Biomedical and Behavioral Research, *Screening and Counseling for Genetic Conditions*, 9–39 (1983). Because of this continually advancing medical technology, the knowledge of one's filiation has become of paramount importance in diagnosing and treating potentially life-threatening disorders, as well as in forecasting the probabilities of latent genetic disorders appearing in the later years of one's life.

Until the early 1970s, blood grouping, and in particular human leukocyte antigen (HLA) testing, was used predominately to determine donor recipient compatibility in organ transplants and hereditary disease research. Now, it is revolutionizing determinations of the identity of a child's father in paternity cases, and, in my opinion, providing critical information for purposes other than custody, support, or visitation.

Through the knowledge of one's hereditary history, as well as the institution of genetic "carrier screening," it is possible to detect various recessive, and often asymptomatic, diseases that may have been passed on through generations of familial lines. A partial list of these diseases includes Tay–Sachs (a disease causing progressive neurological abnormalities with the onset often seen in late infancy

and death occurring within three to four years); sickle cell anemia (a hemoglobin disorder occurring predominantly in the black community); Cooley's anemia (a blood disorder similar to sickle-cell anemia); muscular dystrophy (a disease causing progressive muscular weakness with the onset often seen in late childhood years); hypercholesterolemia (a disease causing high serum cholesterol levels in the third or fourth decade of life); cystic fibrosis (a disease which often secondarily affects the lungs, pancreas, and liver); hemophilia A and B (blood diseases manifested by recurrent hemorrhaging); Huntington chorea (a progressively disabling disease with an onset in the fourth decade of life and death within ten to twelve years from the onset); congenital adrenal hyperplasis (a disease affecting the male and female reproductive system and diagnosed through HLA lineage studies); Ehlers–Danlos syndrome (a skin disorder which is manifested by hyperelastic skin and vascular fragility); Friedreich's ataxia (a progressively disabling muscular disease causing one to be bound to a wheelchair during the second decade of life, and death in the third decade); galactosaemia (a digestive disease causing weight loss, jaundice, cataracts and occasionally mental retardation); gaucher disease (a bone disease occurring predominantly in Ashkenazic Jews); Wilson's disease (a disease manifested by defective copper metabolism which often causes chronic active hepatitis); phenylketonuria (a disease marked by elevated blood and urine phenylalanine which can cause mental retardation if untreated); and xeroderma pigmentosum (a skin disease manifested by the inability to repair damage after exposure to ultraviolet light). *See generally* J.M. Connor & M.A. Ferguson–Smith, *Essential Medical Genetics* 182–201 (1984). As this partial list demonstrates, there are a host of genetic disorders, passed on by one's biological parents, that can either appear in the later years of life, or be passed unwittingly to one's children. In both scenarios, the knowledge of one's biological parents and hereditary history is crucial in ordering one's affairs and making life's decisions.

Perhaps the most telling example of the importance of knowing one's lineage can be seen in the current national focus on the prevention of heart disease. As mentioned above, high blood cholesterol is a disorder which is genetically linked. Studies have indicated that children of parents with hypercholesterolemia demonstrate a proclivity for the same disorder, often beginning at a very young age. Consequently, physicians have found it necessary to place children, as young as six or seven, on severely restricted diets in order to avert complications from high blood cholesterol. Since this particular affliction is rarely monitored until the later years of life, the importance of knowing family history, for purposes of early detection, becomes evident.

Aside from facilitating the discovery of one's genetic history, HLA testing which conclusively establishes the identity of one's natural parent also provides a child with the knowledge of an available source for organ donation in the event of emergency. Frequently, parents or biological brothers and sisters are called upon for donation of kidneys, lungs and other essential organs. Organs donated by family members carrying the same blood type and genetic bond are considerably less susceptible to rejection by the donee's immune systems. So important is the medical information that can be garnered from one's natural parents, that our legislature expressly provided for the disclosure of medical history information to an adopted child's parents or their physician from the adoptee's natural parents. *See* 23 Pa. C.S. § 2909.

Finally, a determination of one's biological parents carries with it legal implications for purposes of inheritance. In addressing the interests of a child born out of wedlock, the United States Supreme Court recognized that:

> The child born out of wedlock, ... has an interest in knowing his father and in having two parents to provide and care for him. The child's concerns include a known belonging to a certain line of descent with knowledge of any benefits or detriments inheritable from that line.

*Rivera v. Minnich,* 483 U.S. 574, 576, n. 2, 107 S.Ct. 3001, 3003, n. 2, 97 L.Ed.2d 473, 478 n. 2 (1987) (quoting *Minnich v. Rivera,* 509 Pa. 588, 594, 506 A.2d 879, 882 (1986)). This same reasoning can be applied, in my opinion, to cases of disputed parentage. Even in cases where the "equitable father" holds himself out as the child's parent, and by authority of a court order raises the child as his own, that child may be, at some point in time, entitled to inheritance as a surviving heir of his or her biological father's estate.

The various circumstances presented above militate one conclusion: there are several instances where "paternity, parentage or identity of a child is a relevant fact," and HLA blood tests should be ordered even though a party is traditionally estopped from presenting the issue or have had paternity already decided on the merits. In these situations, I believe that the court should, in the best interests of the child, order tests to ascertain the identity of the *biological* father. The overriding interests of the child in definitively knowing his or her biological genesis far outweighs the harm that may stem from the revelation. *See* Pa.R.C.P. 4010(a); *see also John M. v. Paula T.,* 377 Pa.Super. 72, 80, 546 A.2d 1162, 1167 (1988) (the "good cause" requirement of Rule 4010(a) is "a limitation upon the right to compel a litigant to submit to the [blood] test[,] ... [and] entails more than mere relevancy.") More importantly, I believe that knowledge of genetic factors that may shorten or reduce the quality of life become important considerations in charting the summer and autumn years of one's life.

In sum, although I agree with the distinguished trial judge's statement that "it is Angie's right to know who her [biological] father is," I am compelled to disagree with his conclusion that appellant's contempt petition should be denied because of the results of the HLA tests. Even though I am suggesting that HLA tests may be warranted in such situations, their use would necessarily be limited to health and inheritance concerns, and *not* for the reversal of a prior validly obtained paternity determination.

Because of the reasons outlined above, I respectfully concur with the majority's disposition of appellant's claims.

BROSKY, Judge, concurring:

I am constrained to concur in the result reached by the majority, although I recognize we are bound to do so under present law.

I write separately, however, to express my concern over the possible ramifications that the current law may produce. In a day and age when scientific knowledge has risen to the level where the identity of a child's biological father can be determined with an accuracy level of 99.7%, I question the wisdom, in a case such as this, of denying the child the right to know her father.

In Pennsylvania we have a line of cases, as discussed by the majority, which hold that a party is estopped from questioning paternity once paternity has been established either by consent or order. *See Wachter v. Ascero*, 379 Pa.Super. 618, 550 A.2d 1019 (1988); *Seger v. Seger*, 377 Pa.Super. 391, 547 A.2d 424 (1988); *Manze v. Manze*, 362 Pa.Super. 153, 523 A.2d 821 (1987); *Chrzanowski v. Chrzanowski*, 325 Pa.Super. 298, 472 A.2d 1128 (1983); *Commonwealth ex rel. Gonzalez v. Andreas*, 245 Pa.Super. 307, 369 A.2d 416 (1976); *Commonwealth ex rel. Palchinski v. Palchinski*, 253 Pa.Super. 171, 384 A.2d 1285 (1978); *Commonwealth ex rel. Weston v. Weston*, 201 Pa.Super. 554, 193 A.2d 782 (1963); *Commonwealth ex rel. Goldman v. Goldman*, 199 Pa.Super. 274, 184 A.2d 351 (1962).

The rationale behind this rule, as expressed in *Commonwealth ex rel. Gonzalez v. Andreas*, supra, is as follows:

Absent any overriding equities in favor of the putative father such as fraud, the law cannot permit a party to renounce even an assumed duty of parentage when by doing so, the innocent child would be victimized.

369 A.2d at 419. This concern over the possible victimization of the child is understandable in the great majority of cases. There is the possibility that the child would be deprived of a father's support, both emotionally and financially, should his paternity be questioned and/or disproven.

Instantly, however, we have the unusual circumstance of not one, but two, men vying for the right to be considered the "father" of this little girl. Both express a willingness to support her and to take his "proper" place in her life. While I recognize the importance of maintaining consistency in the child's life, and I fully respect the relationship cultivated by appellant and the child throughout her lifetime, I must point out that the actions on the part of appellee have already disrupted this little girl's life. She has been deprived of time spent with the only man she has recognized as her father and, there has been mention of the fact that the child's reaction has been so negative that she herself no longer wishes to see appellant. Therefore, in my opinion, the "victimization" of the child has already taken place.

It now remains for the court to return some semblance of order to the child's already shattered life. In so doing, I believe that the Court should examine any and all evidence which could aid it in this difficult task. If indeed, the biological father can be determined and is ready to assume his responsibility, then I believe there should be a departure from existing law which precludes him from being considered because of a "legal fiction" whose purpose may, in this case, not be valid.