BECK, Judge:
 

 Although these cross-appeals arise out of a complicated factual and procedural scenario, the issues posed are well-defined and the proper resolution thereof is clear.
 

 The issues on appeal are whether appellant/cross-appellee, Maria Fitzpatrick, is equitably estopped from question
 
 *272
 
 ing the paternity of appellee/cross-appellant, Richard Gulla, as to a child born to Ms. Fitzpatrick in March 1988, and whether the custody proceedings involving the child should be transferred to Rhode Island under the Uniform Child Custody Jurisdiction Act, 23 Pa.C.S.A. § 5341 et seq. (Supp. 1991). The trial court found that Ms. Fitzpatrick was equitably estopped and that the proceedings should be transferred. We agree on both counts and affirm.
 

 Fitzpatrick and Gulla met in July 1987. They became sexually intimate around the middle to end of that month and their intimacy continued, albeit sporadically, until the following July. Immediately prior to Fitzpatrick’s involvement with Gulla, she had been sexually involved with another man, Major Drummond, for several months. Her relationship with Major Drummond did not end until June 1987.
 

 On August 15, 1987, Fitzpatrick was diagnosed as being pregnant. Upon learning of her pregnancy, Fitzpatrick informed Gulla that the child was his and simultaneously accepted Gulla’s prior proposal of marriage.
 

 Gulla was extremely pleased at the thought of becoming a father. Throughout Fitzpatrick’s pregnancy, Gulla conducted himself as an attentive expectant father, making plans for the child, attending and paying for Fitzpatrick’s pre-natal doctor’s visits, and otherwise contributing to Fitzpatrick’s support. Fitzpatrick accepted this assistance without objection and responded by treating Gulla as if he were indeed the child’s father. She represented that he was the father to a minister they visited at that time and referred to Gulla as the child’s father in a letter to Gulla written in December 1987.
 

 Although the parties had planned to marry in December 1987, the wedding never took place, apparently due to Fitzpatrick’s vacillation on the subject of marriage. In any event, in early March 1988, Fitzpatrick began experiencing labor pains, substantially prior to her scheduled date of delivery. Gulla accompanied her to the hospital and a few days thereafter, on March 10th, she delivered a baby boy. Hospital records and the birth certificate reflect Gulla as
 
 *273
 
 the child’s father. Fitzpatrick participated in the preparation of these documents. With Fitzpatrick’s consent, the child was named Richard Anthony Gulla, after Mr. Gulla whose first name is also Richard.
 

 Toward the end of Fitzpatrick’s pregnancy, Gulla had rented a mobile home for her. He paid the security deposit and at least half of the first month’s rent. He paid for the fuel necessary to fill the home’s heating tank, rented a truck to move Fitzpatrick in and accomplished the move for her. Gulla also paid various hospital bills in connection with Richard’s birth which were not covered by Fitzpatrick’s insurance.
 

 Immediately after Richard was born, Fitzpatrick began residing in the mobile home. Gulla testified that for the first three months of the child’s life, Gulla lived with him and Fitzpatrick and assumed most of the responsibility for caring for the child. Fitzpatrick stated that Gulla was not actually living with her and the child, but did share in caring for the child. Suffice it to say, Gulla was fully involved with all aspects of the child’s life and care. He also contributed to the support of Fitzpatrick and the child by giving Fitzpatrick cash in various amounts from time to time.
 

 Throughout these months, Fitzpatrick continued to assert that Gulla was Richard’s father and accepted Gulla’s support, both financial and otherwise. She raised no doubts on the issue of paternity. In fact, in April 1988 Fitzpatrick executed an affidavit that Gulla was the father, apparently at Gulla’s request.
 

 Since the parties’ relationship was deteriorating, Gulla became concerned over whether he would continue to have a right to have contact with the child. After consulting with a lawyer, in May 1988 Gulla presented Fitzpatrick with a proposed joint custody agreement. Fitzpatrick refused to sign the agreement and, for the first time, asserted that she had doubts as to whether Gulla was Richard’s father. Rather, she expressed the view that Major Drummond
 
 *274
 
 might be the child’s father. She stated that she wished to investigate whether this was in fact the case.
 

 Fitzpatrick explained her sudden change of heart regarding the paternity question by testifying that her doubts concerning the child’s paternity first arose at this time because it was then that she consulted with a friend who was an obstetrician about the fact that the child had been born with wrinkled skin. She stated that she had wondered about the reason for the condition of the child’s skin at birth for some time. Fitzpatrick testified that her friend informed her that such skin is an indication of an overdue child. This revelation, according to Fitzpatrick, convinced her that instead of Richard being premature, as she had thought, he was actually overdue. This would indicate that she had conceived Richard before her involvement with Gulla and during her involvement with Drummond. Thus, Fitzpatrick apparently believes that all of her prior conduct in leading Gulla to believe that he was Richard’s father should be disregarded.
 

 Unfortunately for Ms. Fitzpatrick, this saga does not end here. Rather, the record reveals that although Fitzpatrick did continue to investigate the question of Richard’s paternity through consultation with various doctors, throughout this time she continued to accept financial and other support from Gulla. Although Gulla was then living in his own home, where he had prepared and equipped a nursery for the child, he continued to have constant contact with the child. In fact, he frequently cared for the child while Fitzpatrick sought employment or was otherwise occupied, often having custody of the child in the evenings and all weekend, and he arranged for and paid for three different babysitters to care for the child after Fitzpatrick became employed in August.
 

 In mid-August, 1988, Fitzpatrick told Gulla that she had investigated the matter fully and was once again satisfied that he was the child’s father. Fitzpatrick testified that in actuality, she was still not completely convinced of that fact. Despite these alleged lingering doubts, Fitzpatrick
 
 *275
 
 filed a complaint for child support against Gulla in the Court of Common Pleas for Pike County on August 22, 1988.
 
 [1]
 
 Apparently the complaint was a form provided by the Domestic Relations Office. Although Gulla was named as the defendant on the complaint, Fitzpatrick also checked a box on the form indicating that paternity was as yet “undetermined.” Gulla appeared at the support proceedings and indicated his willingness to support the child. He offered an amount of support and Fitzpatrick agreed to accept that amount. On September 12, 1988, a court order of support in the agreed amount was entered.
 

 Fitzpatrick accepted checks from Gulla pursuant to the court order until October, when she ceased cashing any further checks. Coincidentally, it was also in October when Gulla first filed a complaint for custody of Richard. Fitzpatrick responded by asserting that Gulla was not the child’s father. She immediately refused to allow Gulla to take the child in the evenings or on weekends as he previously had and she enrolled the child in a day care center which was instructed not to release the child to Gulla. Nevertheless, Gulla maintained his contact with the child. He called the day care center every day to check on the child and went to the center frequently to visit with Richard during the day.
 

 On November 10, 1988, the trial court entered an Interim Order, based on a stipulation between the parties, providing Gulla with visitation rights. Thereafter, on December 12, 1988, the court ordered the parties and the child to submit to HLA blood testing. The blood tests conclusively excluded Gulla as the biological father of the child. In May 1989, Fitzpatrick sought and received an ex parte order withdrawing the support complaint she had filed in August 1988 and vacating the support order entered in September. Both parties subsequently filed motions for summary judgment on the issue of custody/visitation. Fitzpatrick argued that
 
 *276
 
 Gulla had no right to custody or visitation because he was not the child’s biological father. Gulla asserted that Fitzpatrick was both collaterally and equitably estopped from questioning his paternity and that he had developed a constructive paternal relationship with the child that could not now be disturbed.
 

 On August 14, 1989, the trial court granted Fitzpatrick partial summary judgment finding that she was not collaterally estopped and denied summary judgment to Gulla. The court found that the mere issuance of a support order at Fitzpatrick’s request did not estop her as a matter of law from questioning Gulla’s paternity. Thus, the trial court refused to apply those cases which have held that entry of a child support order against a man necessarily includes the determination that the defendant is the child’s father, because otherwise there would be no legal duty of support. Thus, the party who sought the support order is thereafter collaterally estopped from raising the paternity issue, which has already been determined as a matter of law.
 
 See, e.g., Commonwealth ex rel. Coburn v. Coburn,
 
 384 Pa.Super. 295, 558 A.2d 548 (1989) (en banc).
 

 As to the remaining issues of equitable estoppel and constructive relationship, however, the court found that a dispute as to the material facts existed and summary judgment was inappropriate. The court ordered hearings on those issues. Gulla appealed to this court. In an unpublished memorandum, we found the order appealed from to be interlocutory and quashed. Gulla then sought allocatur from the Supreme Court. His petition therefor is still pending. •
 

 On the questions of equitable estoppel and constructive relationship, the court held several days of hearings. During the same period, Fitzpatrick sought transfer of the custody proceedings to Rhode Island, where she and the child had relocated in May 1989. The court held decision on that issue until the conclusion of the hearings. On April 19, 1990, the trial court entered the order presently on appeal. In that order, the court found that Fitzpatrick was equita
 
 *277
 
 bly estopped from challenging Gulla’s paternity, that Gulla had established a constructive parental relationship with the child that merited continuation, and that the actual custody decision should be made by the Rhode Island courts.
 

 We begin with the issue of equitable estoppel. This doctrine, as applied in the context of a paternity dispute, has a long history in Pennsylvania. We have the benefit of a recent description of the doctrine by our Supreme Court. In
 
 John M. v. Paula T.,
 
 524 Pa. 306, 571 A.2d 1380 (1990), the court stated:
 

 We see the Commonwealth/family interests highlighted by the “estoppel” cases. In these cases, it is recognized that, under certain circumstances, a person might be estopped from challenging paternity where that person has by his or her conduct accepted a given person as father of the child..... These estoppel cases indicate that where the principle is operative, blood tests may well be
 
 irrelevant,
 
 for the law will not permit a person in these situations to challenge the status which he or she has previously accepted.
 

 The General Assembly has codified the principle of “paternity by estoppel” in its Act of June 17, 1971, P.L. 175, No. 17, § 1,
 
 as amended
 
 by Act of November 26, 1978, P.L. 1216, No. 288 § 1, 48 Pa.Stat.Ann. § 167 (Purdon’s Supp.1989) (hereinafter referred to as “section 167”), which provides:
 

 Children; legitimacy; determination of paternity
 

 (b) For purposes of prescribing benefits to children born out of wedlock by, from and through the father, paternity shall be determined by any one of the following ways:
 

 (1) If the parents of a child born out of wedlock shall have married each other.
 

 (2)
 
 If during the lifetime of the child, the father openly holds out the child to be his and receives the child into his home, or openly holds the child out to be
 
 
 *278
 

 his and provides support for the child which shall be determined by clear and convincing evidence.
 

 (3) If there is clear and convincing evidence that the man was the father of the child which may include a prior court determination of paternity.
 

 Id.,
 
 524 Pa. at 318-19, 571 A.2d at 1386-87 (emphasis in original).
 
 See also Wachter v. Ascero,
 
 379 Pa.Super. 618, 550 A.2d 1019 (1988);
 
 Manze v. Manze,
 
 362 Pa.Super. 153, 523 A.2d 821 (1987).
 

 The
 
 John M.
 
 court went on to discuss, with apparent approval, two cases wherein equitable estoppel was held to prevent a parent from questioning paternity. The first,
 
 In re Montenegro,
 
 365 Pa.Super. 98, 528 A.2d 1381 (1987), presented the classic situation where equitable estoppel has been applied.
 
 Montenegro
 
 involved a man who had held a child out as his own and supported the child for some time and then later attempted to disprove his own paternity through blood testing. We refused to allow him to do so, stating that evidence of blood tests to disprove the father’s paternity was inadmissible since paternity had already been established through the father’s conduct.
 
 Id.,
 
 365 Pa.Superior Ct. at 104, 528 A.2d at 1384.
 

 The other case referred to by the
 
 John M.
 
 court as an example of a slightly different application of the doctrine of equitable estoppel was the Supreme Court’s own decision in
 
 Adoption of Young,
 
 469 Pa. 141, 364 A.2d 1307 (1976). There, the principle was held to operate to bar a mother from questioning the paternity of her son. The mother had held her first husband out as the father of the child. The first husband had been married to the mother when the child was born, lived with them for five months thereafter and then continued to provide financial support for the child, which support was accepted by the mother. After the parties divorced and the mother remarried, she and her second husband sought to terminate the parental rights of the first husband by disproving his paternity. The Supreme Court held the mother estopped from doing so, noting that if the situation were reversed, the court would clearly not
 
 *279
 
 allow the first husband to question his own paternity. Thus, the court applied equitable estoppel principles to bar a mother from questioning the paternity of a man who had treated the child as his own because the mother had acquiesced in the man’s conduct and had accepted his support of the child as well.
 

 The propriety of applying equitable estoppel principles to a mother who seeks to disprove the paternity of a man she has held out as the father of her child was expressly established in
 
 Seger v. Seger,
 
 377 Pa.Super. 391, 547 A.2d 424 (1988). There, the parties lived together out-of-wedlock. The mother became pregnant during this relationship. She represented to the man that he was the father and they married shortly before the child’s birth. They lived together as a family for four years and then separated. The mother then attempted to disprove the husband’s paternity in order to deny him custody/visitation rights.
 

 This court refused to allow the mother to attempt to disprove the husband’s paternity, stating:
 

 It has been stated in numerous cases that a father is estopped from denying paternity by long delay in raising the issue at law (assuming he was aware of non-paternity) and by his acceptance and support of the child during that time. If a father’s conduct works an estoppel on his assertion of non-paternity in a support matter, there is no principle of law which would prevent the same application to a case, such as here, where the mother informs the father he is responsible for the pregnancy, marries him, assigns paternity to him on the birth certificate, permits him to support the child and assume the parental duties for years, and only upon separation repudiates his paternity.
 

 Id.,
 
 377 Pa.Superior Ct. at 397, 547 A.2d at 427.
 

 As these cases reveal, application of the doctrine of equitable estoppel aims at achieving fairness as between the parents by holding them,
 
 both
 
 mother and father, to their prior conduct regarding the paternity of the child. As has frequently been stated, equitable estoppel acts to pre
 
 *280
 
 vent an injustice upon the party asserting the doctrine and will even operate to do so between two innocent parties.
 
 Thatcher’s Drugs of West Goshen, Inc. v. Consolidated Supermarkets, Inc.,
 
 391 Pa.Super. 524, 571 A.2d 490 (1990). However, application of estoppel principles in a case where paternity is at issue also implicates the interests of another person who is completely innocent and whose life will be markedly affected by the outcome of the dispute. That person is, of course, the child. The advisability of applying equitable estoppel in such a case will often be bolstered by the fact that to do so will serve the best interests of the child, who has developed a parent-child relationship with the man who has assumed the responsibilities of fatherhood. As an en banc panel of this court noted in
 
 Commonwealth ex rel. Coburn v. Coburn,
 
 384 Pa.Super. 295, 558 A.2d 548 (1989):
 

 ... the best interests of the child sometimes require that a non-biological parent or stepparent, who has nurtured the child and developed a loving relationship, must be given custody and/or visitation rights even though his relationship with the natural mother may have ended. The mental well-being of the child dictates the necessity for the relationship to continue____ Such a relationship [between child and non-biological parent] cannot be curtailed simply because of a finding that [the non-biological parent] ... is not in fact the natural father____ In this era of artificial insemination, surrogate parenting and in vitro fertilization, legal rights of a non-biological parent may become fixed by virtue of the parties’ actions and the developmental relationship of the child with the parent. To permit one parent to revoke the parentage of the other parent, once those rights have been legally determined, in the absence of fraud, by invoking a blood test, invites chaos to the child’s emotional well-being and legal status.
 

 Id.,
 
 384 Pa.Superior Ct. at 304-05, 558 A.2d at 552-53 (citations omitted).
 

 We agree with the trial court that this is a case where the application of equitable estoppel to prevent Fitzpatrick from questioning the paternity of Gulla is appropriate. Thus, the
 
 *281
 
 results of the blood tests indicating that Gulla is not the child’s biological father are irrelevant and Gulla is entitled to be considered the child’s legal father in connection with custody/visitation rights.
 

 The lengthy recitation of Fitzpatrick’s conduct regarding the paternity of this child which we have set forth above reveals that even prior to the birth of this child Fitzpatrick actively led Gulla and the world to believe that he was the child’s father. She never informed Gulla that there was any possibility that the child was anyone else’s. Consistent with this attitude, she accepted Gulla’s assistance and financial support both in paying medical bills associated with her pre-natal care and delivery of the child and with establishing a home for her and the child. After the child’s birth, she continued to lead Gulla to believe he was the father, once again accepting his financial support and allowing him to bond with the child.
 

 Even when Fitzpatrick allegedly began to question the identity of the child’s father, she continued for several months to accept Gulla’s support. She allowed him to care for the child whenever she needed him to, she accepted financial contributions from him, and she allowed him to arrange for and pay for the child’s babysitters once she began to work. Moreover, it was during the period when Fitzpatrick was allegedly questioning Gulla’s paternity that she initiated support proceedings against him. Having obtained a support order against him, she accepted two month’s payments thereunder, once again acting in a manner consistent with the view that Gulla was the child’s father.
 
 [2]
 

 
 *282
 
 At best, Fitzpatrick’s conduct reveals that she felt that she could vacillate in her own feelings about the paternity of this child, raising questions about it from time to time, and yet that she could also continue to accept Gulla’s support and to allow the child and Gulla to develop a parent-child relationship. At worst, Fitzpatrick’s conduct reveals that she had serious doubts about Gulla’s paternity for a long time and yet did not raise those concerns in order to be able to continue to receive Gulla’s support and assistance. In any event, only after Gulla initiated action to secure custody of the child did Fitzpatrick become consistent in her denial of his paternity in order to free herself of any obligations to him.
 

 Whichever way we view Fitzpatrick’s conduct, the results of it are apparent on the face of this record. Gulla has conducted himself as a devoted and involved father. The child has responded accordingly. Witness after witness who had repeatedly observed Gulla with the child testified as to the loving relationship and close bond that has developed between the child and Gulla. Gulla’s expert witness, a psychologist, also confirmed the parent-child relationship that had developed between the child and Gulla.
 

 We cannot allow Fitzpatrick to sever this tie because she has now finally decided, after many months of representing
 
 *283
 
 to Gulla and the world that he is the child’s father, that indeed Gulla is not the child’s father. To allow her to do so would not only be grossly unfair to Gulla, who himself has acted in a consistent and responsible manner, but would also be highly destructive to this child’s well-being. The child knows only one father — Gulla.
 
 [3]
 
 Moreover, there is no one else who has come forward to offer himself as the father of this child. To remove Gulla will not only allow the child’s only known father to be taken away. It will leave the child fatherless.
 

 We recognize, of course, that this case does not present a situation precisely like that found in many of the estoppel cases. This is not a case where the parties were ever married, nor is it a case where the mother has held the man out as the father of the child for a period of years. We do not, however, find these distinctions to be controlling. None of the cases require that the parties have been married, nor would such a requirement be consistent with the theory of equitable estoppel. Indeed, as a panel of this court stated in
 
 Scott v. Mershon,
 
 394 Pa.Super. 411, 576 A.2d 67 (1990), principles of estoppel are peculiarly suited to cases where the child was conceived out of wedlock and no presumptions regarding paternity apply.
 
 Id,.,
 
 394 Pa.Superior Ct. at 418-19, 576 A.2d at 71. Nor do any of the estoppel cases suggest that a party may not be held to be estopped unless that party’s conduct in holding out the other as the father of the child has continued for several years. The number of years or months involved is not determinative. Rather, it is the nature of the conduct and the effect on the father and the child and their relationship that is the proper focus of our attention. Every such case must be decided after a close analysis of all of the facts and circumstances, with the length of time involved being only one circumstance to be considered.
 

 
 *284
 
 We find no error in the trial court’s determination that Fitzpatrick is equitably estopped from questioning the paternity of Gulla.
 

 We now turn to the second issue posed, i.e. should the determination of the extent of Gulla’s custody/visitation rights be transferred to Rhode Island under the Uniform Child Custody Jurisdiction Act, now codified at 23 Pa.C.S.A. § 5341 et seq. (1991) (the “Act”). The trial court found that transfer was appropriate because the child and his mother have resided in Rhode Island since May 1989 and the determination of what custody arrangement would be in the child’s best interests would be most easily made in that state.
 

 Gulla appeals this determination, arguing that the child’s early life was spent in Pennsylvania, these proceedings have been conducted in this state, and it is here that the evidence as to the child’s care during its first year is most readily available. Alternatively, Gulla argues that New York, where Gulla himself resides, would be a more appropriate forum.
 
 [4]
 

 As both parties recognize, the Act would permit the courts of either Rhode Island or this Commonwealth to decide custody in this case.
 
 See
 
 23 Pa.C.S.A. § 5344. Therefore, we must decide which of these fora, both having jurisdiction, would be the better of the two.
 

 Section 5348 of the Act, entitled “Inconvenient forum,” states that the following factors, among others, are pertinent to the court’s decision as to whether transfer of the case to another jurisdiction is warranted:
 

 (1) If another state is or recently was the home state of the child.
 

 
 *285
 
 (2) If another state has a closer connection with the child and his family or with the child and one or more of the contestants.
 

 (3) If substantial evidence concerning the present or future care, protection, training, and personal relationships of the child is more readily available in another state.
 

 (4) If the parties have agreed on another forum which is no less appropriate.
 

 (5) If the exercise of jurisdiction by a court of this Commonwealth would contravene any of the purposes stated in section 5342 (relating to purposes and construction of sub-chapter).
 

 Of course, application of these factors allows the court considerable discretion and will vary greatly depending on the facts of the particular case.
 
 See, e.g., Aldridge v. Aldridge,
 
 326 Pa.Super. 49, 473 A.2d 602 (1984). We will not reverse a trial court’s decision to decline jurisdiction absent an abuse of that discretion.
 
 In re Adoption of K.S.,
 
 399 Pa.Super. 29, 581 A.2d 659 (1990).
 

 In considering these factors in light of the facts of this case, either Rhode Island or Pennsylvania could be viewed as an appropriate forum. Both states have been the child’s home state for substantial periods of time. While Gulla lives in New York, his business is in Pennsylvania and it appears that at least some of his extended family is here as well. On the other hand, Fitzpatrick and her parents live in Rhode Island. Moreover, there is evidence pertinent to the child’s care present in both states. Witnesses who would testify as to Gulla’s parenting and home life are largely in Pennsylvania, although some are in New York, whereas witnesses who could testify as to Fitzpatrick’s parenting and home life over the last two years are in Rhode Island.
 

 Despite this apparent balance between the convenience of the two fora, we find that the presence of the child and his mother in Rhode Island for the past two years tips the balance in favor of that state. As the trial court found, Rhode Island is the state where the child has been
 
 *286
 
 for the majority of his young life and where he has lived most recently. It is there that he is enrolled in school, there that his doctor is located, and there that his mother and her parents are located. There is no indication on the record that the mother intends to relocate from Rhode Island in the near future. Moreover, the fact that the courts of this Commonwealth have already had some involvement with this case, and have issued two temporary custody orders based on stipulations of the parties, does not require that we retain jurisdiction. This is only one factor to be considered.
 
 Hattoum v. Hattoum,
 
 295 Pa.Super. 169, 441 A.2d 403 (1982). We do not consider it to be determinative in this case, particularly since no Pennsylvania court has ever actually conducted a best interests analysis concerning this child, both interim orders having been entered on stipulation of the parties. Thus, we find that the courts of Rhode Island are best suited to make a determination of the future best interests of this child.
 

 The order of the trial court is affirmed in all respects.
 

 [1]
 

 . Gulla testified that Fitzpatrick had become dissatisfied with the amount of money he had voluntarily been giving her and this motivated the filing of the support complaint.
 

 [2]
 

 . Fitzpatrick contends that her filing of a support complaint against Gulla should be accorded no relevance because on the face of the form complaint, she checked a box indicating that paternity was as yet undetermined. She also contends that no relevance should be attached to the fact that a support order was entered on her complaint because, as we have pointed out in text above, the trial court has decided that she was not collaterally estopped by virtue of having obtained a support order against Gulla.
 

 We reject both of these arguments. First, the fact that the trial court has decided that the entry of a support order against Gulla does
 
 *282
 
 not collaterally estop Fitzpatrick as a matter of law does not mean that we must completely ignore the fact that Fitzpatrick brought a support action against Gulla in deciding the equitable estoppel issue before us now. The trial court's decision that Fitzpatrick is not collaterally estopped, as to which allocatur before the Supreme Court is pending, does not preclude equitable estoppel because these are two distinct legal doctrines. Collateral estoppel precludes a party from raising an argument that has already been finally adjudicated by a court of law.
 
 See Commonwealth ex rel. Coburn v. Coburn,
 
 384 Pa.Super. 295, 558 A.2d 548, 551 (1989) (en banc). As applied in paternity actions, the doctrine provides that where a woman secures a child support order against a man, the entry of that order necessarily includes a judicial determination of paternity. Equitable estoppel, on the other hand, refers to estoppel created by a party’s conduct and has nothing to do with a prior judicial determination. Thus, while Fitzpatrick may not be collaterally estopped by the existence of the support order, the fact that she sought and obtained the order and accepted payments under it is certainly one factor relevant to equitable estoppel.
 

 [3]
 

 . Gulla has continued to visit with the child during these proceedings, thus further developing their relationship.
 

 [4]
 

 . We reject the suggestion of New York as a more appropriate forum than Rhode Island without substantial discussion. The child in question has never lived in New York and there are no significant connections between the child and that state. Thus, we deal only with the question of whether this Commonwealth is the preferable forum.