OPINION OF THE COURT
Marjory D. Fields, J.
Petitioner father initiated this paternity proceeding on May 1, 1992, seeking an order of filiation of the child Nia, born January 18, 1992. After two attempts at service, respondent mother appeared in court on August 12, 1992. Counsel was assigned to respondent and she entered a denial. Blood tests were ordered on respondent’s application. The blood tests excluded petitioner as the child’s father. Notwithstanding this result, petitioner seeks entry of the order of filiation on the ground of equitable estoppel.
The child is also the subject of a child protective proceeding. The child protective proceeding against respondent mother was initiated on April 20, 1992. The child was released to petitioner father on that date and remains with him to this date. The Law Guardian supported the child’s release to petitioner.
The court found after inquest on respondent mother’s default, on October 21, 1992, that respondent mother had abused the child. The court found that the two-month-old child suffered second degree burns on both feet and had an ear infection; respondent mother failed to take the child for medical attention promptly; and respondent mother’s explanation was inconsistent with the nature and extent of the injuries based on the child’s age. The dispositional hearing has been held in abeyance pending the outcome of this paternity proceeding.
After review of the testimony and blood test results, and on the Law Guardian’s consent, the court prohibits respondent from denying petitioner’s paternity, based on the doctrine of equitable estoppel, notwithstanding that the blood test results exclude petitioner as the child’s father, and grants an order of filiation to petitioner.
Petitioner’s testimony was forthright and credible. He testified that he first had sexual intercourse with respondent mother, hereinafter "respondent”, on March 9, 1991, and had sexual intercourse with her every two or three days thereafter for several weeks. He testified that she told him subsequently that she thought she was pregnant, and they were together when she called for the results of the pregnancy test. Peti *469 tioner testified he took respondent to enroll in a prenatal program. During the pregnancy, respondent told her aunt and members of petitioner’s family that petitioner was the father of the child, he testified.
Petitioner testified that the morning after the child’s birth, respondent telephoned him, and that he went to the hospital the next morning. He testified that respondent told the doctors and nurses that he was the father of the child, that he and respondent completed a form to have his name on the birth certificate, and put this form under the door of the hospital social worker’s office. Petitioner’s name is not on the birth certificate because he did not have another necessary Health Department form, petitioner testified.
Petitioner testified that he visited the child during her first two months, when she lived in Brooklyn and then when she moved to the Bronx. He testified that respondent contacted him at his job, through the use of his beeper, when the child sustained severe burns on her feet in April 1992. He testified that he left work immediately and traveled 45 minutes on a subway to respondent’s home. When he arrived, respondent was not dressed to go to the hospital. Petitioner and his cousin took the child to the hospital. The child was hospitalized for 2Vn weeks and petitioner stayed with the child day and night the entire time, he testified. Respondent visited twice, and said once she would stay overnight, but never did, according to petitioner. Respondent confirmed her failure to visit when she testified.
The child has resided with petitioner since her release from the hospital, in April 1992, after respondent told the Child Welfare Administration (CWA) caseworker that petitioner was the child’s father, petitioner testified. He has provided full financial and emotional support for the child. He further testified that "the child clings to him * * * we have a bond * * * we have done everything together.”
Harold Carter, petitioner’s cousin, testified on petitioner’s behalf. He testified he first met respondent when she was in a car accident while pregnant. Mr. Carter testified that at that time, petitioner stated he was the father of respondent’s child, and was upset that she was "hanging out” and had gotten into an accident. Mr. Carter testified further that petitioner told him, before the child’s birth, that petitioner had to start saving for the baby. Petitioner again told Mr. Carter he was the father, when the two took the child to the hospital after she had been burned.
*470 Mr. Carter testified that he had heard respondent ask petitioner to provide for the baby’s medical needs, and that petitioner had agreed to provide support. He confirmed that respondent paged petitioner when the child was burned. Mr. Carter concluded by testifying that respondent never told him petitioner was not the child’s father, and did not name anyone else as the child’s father.
Respondent’s actions have been contrary to her claim that petitioner is not the child’s father. Respondent appeared in court first on August 12, 1992 even though the child had been in petitioner’s care since April 20, 1992. Between April 20, 1992 and August 12, 1992, respondent took no action to have the child removed from petitioner’s home, or to deny his paternity. Respondent for the first time denied that petitioner was the child’s father on August 12, 1992.
Respondent’s testimony was incredible. During direct examination she was staring ahead, and answered in a monotone. On cross-examination she was defensive, hostile, muttered under her breath, and exhibited a selective memory. She testified that for several months in the spring 1991, she had sexual intercourse daily with a man named "Kenny”, without using contraceptives. Respondent testified Kenny lived with his family in the same apartment building where she lived with her family. Yet, respondent testified she does not know Kenny’s last name, where he lives now, or when the relationship with him ended. She testified she had sexual relations with the petitioner only once. She denied telling anyone that petitioner was the child’s father. She testified she told petitioner she did not know if he were the father.
Respondent testified she never considered petitioner the child’s father, never asked him for support and denied calling him about the baby’s well medical care. She claimed she called him when the child was severely injured because she had no one else to call. Respondent gave no reason for failing to go with petitioner to take the child to the hospital. She claimed because she had been cut off public assistance, she did not come to see the child during the child’s two-week hospitalization.
The Child Welfare Administration caseworker, Gloria Welch Lopez, testified that she is the caseworker assigned to respondent’s case. By contrast to respondent’s testimony, she testified credibly that respondent told her petitioner was the child’s father, and that respondent agreed that the child *471 should be released to petitioner’s care after the child protective proceeding was commenced. Ms. Lopez testified respondent never named anyone else as the child’s father.
The doctrine of equitable estoppel is invoked in the interest of fairness to prevent the enforcement of rights which would work a fraud or injustice upon the person against whom enforcement is sought. (Nassau Trust Co. v Montrose Concrete Prods. Corp., 56 NY2d 175, 184 [1982].) Equitable estoppel has been applied to the issue of paternity (Matter of Sharon GG. v Duane HH., 63 NY2d 859 [1984]; Matter of Ettore I. v Angela D., 127 AD2d 6 [2d Dept 1987]; Matter of Boyles v Boyles, 95 AD2d 95 [3d Dept 1983]; State of New York ex rel. H. v P., 90 AD2d 434 [1st Dept 1982].) "[T]he paramount concern in this type of case should be the best interests of the child.” (Matter of Ettore I. v Angela D., supra, 127 AD2d, at 14.)
Equitable estoppel has been applied to protect the father-child relationship even when the blood tests excluded the man as the biological father. (Matter of Ettore I. v Angela D., supra, 127 AD2d, at 16; Matter of Boyles v Boyles, supra, 95 AD2d, at 97.) In all the reported New York appellate decisions, however, the Courts invoked equitable estoppel in part, to protect the legitimacy of the child. Preserving the child’s legitimacy was not the exclusive reason for those decisions, nor is that result essential to the application of the doctrine of equitable estoppel.
In this proceeding, the child was born out of wedlock. With no case directly on point from this jurisdiction, the court turns to another jurisdiction for guidance. In Gulla v Fitzpatrick (408 Pa Super 269, 596 A2d 851 [1991]), the intermediate appellate court in Pennsylvania estopped a respondent mother from denying paternity of a putative father, to whom she was never married, notwithstanding a blood test excluding him as the father. That court applied the doctrine of equitable estoppel even though the child was not legitimated by the determination.
The Pennsylvania court focused on the mother’s behavior in leading the man to believe he was the child’s father. She had told him he was the father, and accepted his participation in prenatal classes and his financial assistance during her pregnancy. (Supra, 596 A2d, at 853.) The father accompanied her to the child’s birth and the hospital records stated he was the father. (Supra, 596 A2d, at 853.) After the child’s birth, the mother continued to represent that he was the father, allow *472 ing him to provide financial assistance for the child, and bond with the child. She even filed an application for support against the father. (Supra, 596 A2d, at 854.) The man, relying on the mother’s representations, conducted himself as a devoted and involved parent. He developed a close parent-child relationship with the child.
The Pennsylvania court concluded that to deny the order of filiation would be unfair to the father, and destructive of the child’s well-being. (Supra, 596 A2d, at 858.) It applied the doctrine of equitable estoppel because the result would serve the best interests of the child, who had developed a parent-child relationship with the man who had assumed the responsibilities of fatherhood. (Supra, 596 A2d, at 856.) Finally, the Pennsylvania court found that the child would be fatherless if the paternity petition were denied. (Supra, 596 A2d, at 858.)
In the instant case, respondent represented through words and actions that petitioner is the child’s father. Respondent told petitioner, both their relatives, hospital officials, and the CWA caseworker that petitioner is the child’s father. She accepted his financial and emotional support before and after the child’s birth. She contacted him at the time of the birth. She permitted him and his mother to visit and care for the child. She requested his assistance to transport the child to the hospital when the child was severely burned. She did not interfere with his indefatigable care for the child during the child’s hospitalization. She agreed the child should be released to petitioner’s care in April 1992. She permitted a father-child and grandmother-child bond to flourish, and did not deny petitioner’s paternity until after he filed the paternity petition. Respondent never named anyone else as the child’s father until she testified on November 2, 1992. Respondent’s statements and conduct encouraged petitioner and the child to develop a father-child relationship.
Petitioner and his mother accepted the child in their home upon her release from the hospital. They have provided a stable home environment for her since that time. Petitioner father has provided full financial support for her. Petitioner’s statements and conduct have been unwavering, even after learning the blood test results.
The child has resided with petitioner and his mother for 9 of her 12 months of life. She has bonded with petitioner and he is the only father she knows. As in Gulla (supra), if petitioner were not declared the father, the child would be *473 fatherless. The biological father has failed to assert his parentage, and would not be entitled notice of any termination of parental rights proceeding pursuant to Social Services Law § 384-c, or to notice or consent to an adoption of this child. (Domestic Relations Law §§ 111, 111-a; Matter of Robert O. v Russell K., 80 NY2d 254 [1992].) Thus, it is in the best interests of the child, that this father-child relationship be maintained and petitioner be adjudicated her father.
Based on the foregoing, and the Law Guardian’s agreement, the court determines that respondent is equitably estopped from denying petitioner’s paternity. An order of filiation is granted to petitioner.