*865 OPINION OF THE COURT
Phoebe K. Greenbaum, J.
On January 29, 1992 Wilfredo V. filed the paternity petition herein seeking an order of filiation for the child Delilah G. The mother of the subject child is respondent Elena G. who was married to John G. at the time of the child’s birth. John G. as respondent/intervenor (hereinafter intervenor) on this paternity petition claimed that he, and not petitioner Wilfredo V., is Delilah’s natural father and moved for an order to deny the petitioner’s request for court-ordered HLA/DNA blood grouping tests of all of the parties including John G. and to dismiss this paternity petition based on the doctrine of equitable estoppel.
In the alternative, John G. seeks an order of visitation with the child Delilah. The paternity petition and the visitation petition were heard together.
Respondent Elena G. and intervenor John G. were married on January 30,1971. During the course of their marriage Elena G. gave birth to two children: Roseviolet born on July 9, 1971 and Delilah. Only Delilah is the subject of these proceedings.
Delilah was born on June 19, 1984.
Wilfredo V., the petitioner, testified, that he and Elena G. were involved in a sexual relationship at the time of the conception of Delilah and that sometime after the child’s birth he was incarcerated in a Federal prison. He served a sentence of 54 months and was released from prison about October 1990.
Respondent mother does not dispute that petitioner Wilfredo V. is the natural father of the child. She acknowledges without reservation that he is the father. Furthermore, Elena G. and Wilfredo V. submitted themselves and the child Delilah for HLA blood grouping tests for their own information.
As a procedural matter, the equitable estoppel issue raised by intervenor John G. and the issues of fact relating to such a defense should be resolved before a determination is made if such blood grouping tests are to be ordered and admitted into evidence. (Mancinelli v Mancinelli, 203 AD2d 634 [3d Dept 1994], citing Terrance M. v Gale C., 193 AD2d 437 [1st Dept 1993], and Michaella M. M. v Abdel Monem El G., 98 AD2d 464 [2d Dept 1984].)
After Delilah’s birth, the respondent mother Elena G. and Delilah resided together with John G. for six years. John G. testified that, for the period of time prior to the conception of Delilah and for the critical period of conception, he and Elena *866 regularly engaged in sexual intercourse. John G. was present in the hospital at the time of the child’s birth and took the child and Elena home from the hospital. John G. was named as the father on the child’s birth certificate and he was named as the father during the baptism ceremony at church. When the child was registered at school, she was registered as Delilah G. and John G. was listed as her father on the Board of Education records.
The testimony of Elena G. and John G. was in sharp contrast. John G. stated that during the time that Elena and the child lived with him, he was the only father Delilah knew; he read to her, played with her, took her to birthday parties, went to the beach with her, took her to church and to visit family and acted in all ways as a father to her.
Elena’s testimony described these years as living mostly alone with her children although John G. technically lived in the home, he was always at work as an associate pastor of a church, was never attentive to her or the children even when he was at home. Elena repeatedly stated, "I never had a life with John.” She continuously denied having sexual intercourse with John G. for years prior to Delilah’s conception. She further stated she informed John G. several times that he was not Delilah’s father.
According to Elena’s testimony she was out of the marital home on weekends spending time with Wilfredo V. and after he was incarcerated, she went to Pennsylvania to visit him in prison and occasionally took Delilah with her. Elena said she was able to do this because John was frequently not in the house. Even though there was testimony regarding family outings which John attended with Elena and Delilah, the court accepts Elena’s testimony that John worked a long week and very late hours.
She left the marital home when Roseviolet got married.
Almost contemporaneous with the petitioner’s release from prison in October 1990 the respondent mother Elena G. left the marital home with Delilah and went to live with petitioner Wilfredo V. The respondent mother and the child Delilah have continuously lived with petitioner Wilfredo V. to this day.
It is acknowledged that the presumption of legitimacy has been termed one of the strongest and most persuasive known to the law. (Matter of Findlay, 253 NY 1, 7 [1930].) Above all else, to promote the welfare, stability and best interests of the child the doctrine of equitable estoppel has regularly been ap *867 plied, in paternity matters (see, Matter of Campbell v Campbell, 149 AD2d 866 [3d Dept 1989], citing Matter of Ettore I. v Angela D., 127 AD2d 6 [2d Dept 1987], and Matter of Montelone v Antia, 60 AD2d 603 [2d Dept 1977]).
The general rule in New York is that an estoppel "is imposed by law in the interest of fairness to prevent the enforcement of rights which would work fraud or injustice upon the person against whom enforcement is sought and who, in justifiable reliance upon the opposing party’s words or conduct, has been misled into acting upon the belief that such enforcement would not be sought” (Nassau Trust Co. v Montrose Concrete Prods. Corp., 56 NY2d 175, 184 [1982]) citing White v La Due & Fitch, 303 NY 122, 128 [1951]).
In determining whether to apply the doctrine of equitable estoppel, the overriding rationale of the court is to "zealously safeguard the welfare, stability and best interests of the child”. (Matter of Ettore I. v Angela D., supra, at 13.)
The doctrine of equitable estoppel has been applied to protect the father-child relationship even when blood tests excluded the man as the biological father. (Matter of Anton W. v Nadia V., 157 Misc 2d 467 [Fam Ct, Bronx County 1993].) In that case the child bonded with the petitioner, he was the only father the child knew. (Similarly, Matter of Boyles v Boyles, 95 AD2d 95 [3d Dept 1983].) It is acknowledged that to repudiate a functioning parent-child relationship would damage the psychological well-being of a child. "When we reflect upon the emotional fragility of a child of such tender age and the child’s need for continuity, we would be remiss if we failed to note that the inevitable effect of destroying the child’s image of her family would be catastrophic and fraught with lasting trauma.” (Matter of Ettore I. v Angela D., supra, at 15.)
In these cases the court is concerned with the probable traumatic effect upon the child of suddenly terminating a father-child relationship where the child believes that this person is the father. The utilization of the defense of equitable estoppel has been effective to thwart the destruction of an existing parent-child relationship and furthermore, "if there is anything that the body of case law does suggest it is that the paramount concern in this type of case should be the best interests of the child”. (Matter of Ettore I. v Angela D., supra, at 14.)
For the reasons stated below this court finds, in consideration of the totality of the facts and circumstances herein, that this is an inappropriate case to apply the doctrine of equitable estoppel.
*868 In the case at bar the petitioner has sufficiently overcome the equities in Mr. G.’s favor and has shown that currently invoking the doctrine of equitable estoppel in favor of John G. would not be in the best interests of the child Delilah. There is absolutely no father-child relationship that now exists between John G. and the child Delilah. Unlike all the cases above cited, the facts of this case differ in this very important aspect.
This petition, as noted above, was commenced one and one-half years after the child had been living with the petitioner Wilfredo V. and her mother in a family unit and by that time the child had already referred to the petitioner Wilfredo V. as her true father. John G. never again contributed to the support of the child although there was a petition for support drawn by respondent mother Elena G. but not pursued to its conclusion in 1991. Throughout the trial Elena maintained that she contributed substantially to the support of the marital household and the child by working at various jobs and having foster children in the home.
There was also sporadic visitation for John G. from October 1990 through August 1991. On August 3, 1991 it is alleged that John G. attempted to run over Wilfredo V. with the van he was driving when Delilah was a passenger. After that all contact between John G. and the child ceased. Since August 3, 1991 Elena G. and Wilfredo V. have not agreed to allow John G. to have visitation with Delilah. The forensic evaluations prepared and submitted shortly after the commencement of these proceedings did not recommend visitation between John G. and Delilah.
Dr. Ruth Cohen, psychiatrist, evaluated all the parties as early as October 1992 and a second time in May 1994. Both reports have been admitted into evidence.
The first report makes the following observations: "Delilah G. is a likeable 8-year old youngster who was forthcoming during the interviews. She spoke primarily about her close identification with her mother and Freddie V. She perceived them as providing love and security for her. Delilah seemed to have an underlying fearfulness with regard to the visitation issue and its implications with regard to who is her father. Her clinging devotion to her mother and Freddie may have some relationship to her fear that she will be separated from them. On the other hand, she seemed to describe many positive features to their daily household experience. Delilah seemed alienated from John G. She repeatedly spoke of unhappy experiences that she had with him or of observations that displeased *869 her about his interactions with others in her family. "Despite what John G. has said about the close relationship that he has always had with Delilah, the child at this point has no interest and is indeed terrified at the thought of seeing John. On the other hand, she has a strong, positive attachment to Freddie, and speaks of him as her father. It would seem that any attempts to force visitation between the child and John would cause further terror and disorganization in Delilah.”
When the testimony in these proceedings concluded on July 24, 1994 the child Delilah had been residing with Mr. V. for almost four years. By the time this court renders its decision and order in this matter, it will be five years (Oct. 1995) that Delilah has lived with Mr. V. and her mother.
Dr. Cohen’s report to the court is unequivocal in establishing that Delilah’s current psychological stability and well-being are rooted in her belief that Wilfredo V. is her true and only father. Her relationship with John G. is, at this point in time, nonexistent. Delilah refuses to see, visit or have any contact with John G. Dr. Cohen’s updated report of May 30, 1994 makes the following relevant conclusions: "Delilah appears to be a happy and thriving nearly 10-year-old youngster. She spoke with great satisfaction about her life and about her parents, Elena G. and Freddie V. She continues to use the name V. for herself. I believe that it is essential for Delilah’s well being that she remain in the care of Freddie V. and Elena G. She feels secure with them and they appear to be providing her with a good lifestyle. I believe it would be severely detrimental to Delilah at this point if she were ordered to have visits with John G. She would undoubtedly resist, and at her age she is capable of running away or physically fighting off any attempts at visits. From a psychological standpoint, such visits would be extremely damaging to her sense of stability. Once Delilah is assured she can remain with Freddie and Elena, and that John poses no opposition to this, the child may become amenable to seeing John. As long as she fears that he wants to present himself as her father, I believe she will always be hostile to interactions with John.”
It is clear that the intervention by John G. in Wilfredo V.’s petition for an order of filiation and Mr. G.’s own petition for visitation have already caused Delilah anxiety and psychological harm. It is apparent to the court that Delilah views these proceedings as a threat to her sense of family security. The stark reality is that Delilah believes her paternal bonds to be with Mr. V. and she has bonded with him emotionally and *870 psychologically. Delilah now enjoys the attention and closeness of the family unit she has now; she is happy.
Elena G. did take advantage of John G., by continuing to live with him after Delilah was born, allowing his name to appear as "father” on Delilah’s birth certificate, letting Delilah be baptized under his name and by enrolling Delilah in school under his name.
The motion by John G. to have the court apply the doctrine of equitable estoppel requires the application of a two-prong test. "Once the husband had claimed paternity and made the requisite showing of operative facts to support an estoppel, it was incumbent upon the wife to show why an estoppel should not be applied in the best interests of the child.” (Matter of Sharon GG. v Duane HH., 95 AD2d 466, 469 [3d Dept 1983], affd 63 NY2d 859, citing Matter of Boyles v Boyles, 95 AD2d 95, supra.)
Consequently, with regard to the matter herein, considering the circumstances and the length of time that Wilfredo V. and Elena G. had allowed John G. to believe he was Delilah’s biological father (including drawing a child support petition against him and allowing visitation between him and Delilah to take place), based upon the civil standard of preponderance of the evidence and technically applying the elements of estoppel (representation, reliance and detriment), John G. has met his burden of proof and has sufficiently shown those elements. The court concludes that John G. has made a requisite showing of operative facts to establish a prima facie defense on the basis of equitable estoppel.
Nevertheless, the court concludes that petitioner Wilfredo V. has met his burden of establishing the second prong of the test and has shown that the best interests of Delilah would not be served by applying the doctrine of equitable estoppel to the paternity petition herein.
An estoppel does not exalt the interests of the person seeking to impose the estoppel over that of the child. (Matter of Boyles v Boyles, supra, at 98, n 2.)
The pragmatic reality of Delilah’s present and continuing state of mind, as evidenced by the two forensic reports prepared by Dr. Cohen, is that John G. is not her "father” and that she knows and steadfastly believes that Wilfredo V. is her father, both biologically and psychologically. Furthermore, she steadfastly believes and adheres to the concept that her family unit consists solely of herself, Mr. V. and Ms. G.
*871 The court must focus on what is in the best interests of Delilah in the present, the here and now of her life. The pragmatic reality of Delilah’s present life circumstances and present state of mind is that John G. is virtually a stranger to her and a threat to her family as she believes it to be.
If this court were to grant Mr. G.’s application to apply the doctrine of equitable estoppel to the paternity petition herein, it would not serve the best interests of the child Delilah. This court cannot ignore the reality of what has been Delilah’s stable life circumstances for almost five years. This court must promote the welfare, stability and best interests of the child (Matter of Campbell v Campbell, 149 AD2d 866, supra) and repudiate any attempt to impose catastrophe and lasting trauma to the psychological well-being of the child. (Matter of Ettore I. v Angela D., 127 AD2d 6, supra.)
Therefore, "to meet the need for a just and pragmatic result”, the efforts of John G. "to vindicate his rights must give way to the child’s emotional well-being”. (Matter of Ettore I. v Angela D., supra, at 15.)
The societal interests in shielding a child from being branded illegitimate are secondary to the principal object in a paternity proceeding which is the welfare of the child. (Matter of Ettore I. v Angela D., supra, at 14-15 [citing 1 Shatkin, Disputed Paternity Proceedings, § 1.09, at 1-48 — 1-49 (4th ed rev 1985)].) Moreover, the stigma of illegitimacy or being born out of wedlock in present day New York City society and culture has lost its sting.
Accordingly, the court finds that, the motion of intervenor John G. to apply the doctrine of equitable estoppel to the paternity petition herein is denied in the best interests of the subject child Delilah, and it is ordered, that the motion by petitioner Wilfredo V. to have the parties and the child submit themselves for blood grouping tests is granted. John G. may appear in court to submit himself for such blood grouping testing with Wilfredo V., Elena G. and the child Delilah. The court would be empowered to make a negative inference on the issue of paternity against John G. if he chooses not to participate in the blood grouping testing.
It is further ordered that the petition of John G. for an order of visitation with Delilah is denied without prejudice in the best interests of the child for the reasons stated above.