Matter of Fidel A. v Sharon N. (2007 NY Slip Op 51257(U))

[*1]

Matter of Fidel A. v Sharon N.

2007 NY Slip Op 51257(U) [16 Misc 3d 1104(A)]

Decided on June 14, 2007

Family Court, Bronx County

Gribetz, J.

Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.

This opinion is uncorrected and will not be published in the printed Official Reports.

Decided on June 14, 2007

Family Court, Bronx County
In the Matter of a Paternity Proceeding Fidel A., Petitioner,
against
Sharon N. and Wayne Na., Respondents.
P16461/04

Appearances:
Judith R. Liebowitz, Esq., for Petitioner Fidel A.
Lisa M. Licata, Esq., for Respondent Sharon N.
Joan Ann Bourne, Esq., Guardian ad litem for Respondent Sharon N.
Thomas J. Caruso, Esq. for Respondent Wayne Na.
Tamara Steckler, Esq., (Legal Aid Society Juvenile Rights
Division) by Holly B. Graham, Esq., Law Guardian for the
child

Sidney Gribetz, J.
This case calls upon the Court to determine the competing claims of two men to the paternity of a child, Felicity N., whose mother is the subject of an Article 10 child neglect proceeding. Each man was led to believe by the mother that they were the father of the child; each was involved in the child's care at certain times during the first 21 months of her life, prior to the filing of the child neglect petition. One man, the petitioner Fidel A., has been determined by a DNA Blood Grouping Test to be the biological father of the child. The mother and the other man, respondent Wayne Na., had executed a formal Acknowledgment of Paternity [*2]pursuant to Public Health Law § 4135-b.
Mr. A. filed this petition pursuant to Article 5 of the Family Court Act seeking an Order of Filiation declaring him to be the father. In response, Mr. Na. filed a motion seeking to invoke the doctrine of equitable estoppel to uphold the Acknowledgment of Paternity and prevent Mr. A. from being adjudicated the father.
BACKGROUND
This family came to the Court's attention on February 6, 2004 upon the filing by the Administration for Childrens' Services ("ACS") of a petition pursuant to Article 10 of the Family Court Act charging the mother, Sharon N., with Neglect of her daughter Felicity N.[FN1] The ACS petition listed the father of the child as "Unknown". The petition alleged in pertinent detail that Felicity suffered from pneumonia, enlarged lymph nodes, an enlarged liver, and other diagnosed ailments, and that when the child was hospitalized, the mother refused to consent to further medical testing to rule out cancer or another life-threatening disease, and refused to consent to medical treatment of the child. Upon the filing of the petition, the child was removed from the mother's care and remanded to ACS. After various preliminary proceedings, a hearing was held on February 19, 2004 pursuant to Family Court Act §1028 upon the mother's seeking the return of the child.
During the 1028 hearing, Ms. N. testified under oath and was asked who Felicity's father was. She replied "Wayne Na.". When asked directly "Has Wayne Na. been involved in the upbringing and care of Felicity?", she answered "Yes". "Do you still see each other?" "Yes".
I denied and dismissed the 1028 application, continued the remand, and set the case down for a pre-trial conference for March 31, 2004. On March 4, 2004, Ms. N. filed an order to show cause asserting that Felicity was soon ready to be released from the hospital and demanding that resources, including the father, Wayne Na., be explored. At the March 31, 2004 court hearing, Mr. Na. appeared for the first time, and he presented himself to the Court and ACS seeking to take responsibility for Felicity. He had been visiting Felicity at the hospital and was involved in her medical treatment. The Court was shown the Acknowledgment of Paternity at this time. Accordingly, Felicity was paroled to the care of Mr. Na., where she remains until this day. Mr. Na. has since dedicated himself to providing daily care to this critically ill child, and he has attended to all of her medical needs.
During this time, Mr. A. was incarcerated for unrelated criminal charges. By letter dated June 20, 2004, Mr. A. wrote to the Court from prison. In this letter, he claimed that his daughter [*3]Felicity was taken from the mother's custody by the court and "given to another man named Wayne". Mr. A. stated that he was concerned about his daughter and that his parents were available to care for Felicity. He was anticipating release from prison on parole in September, and as a member of the plumbers union and in contact with his former boss, he would be gainfully employed upon his return to society. Thereafter, in July 2004, Mr. A. filed the instant Paternity petition from prison. Upon his release from prison in the fall, he attended court during the Article 10 proceedings. His first appearance on this Paternity docket was October 25, 2004, at which time he was assigned 18-B counsel, and a DNA test was ordered.
Meanwhile, a finding of neglect was entered against the mother after trial, and ongoing dispositional proceedings were conducted on the Article 10 case, together with related hearings on this paternity docket. Mr. A. requested visitation with Felicity. Upon the recommendation of ACS caseworkers and the law guardian, determination of the request for visitation was held in abeyance until he received training in how to tend to Felicity's medical needs. Mr. A. did not avail himself of these referrals at that time.
The DNA test results were certified by the lab on December 28, 2004 and presented to the Court in February 2005. The DNA test established a 99.92% probability that Mr. A. was Felicity's father.
In the fall of 2005, Mr. A. was incarcerated again. At this time, his mother, Carmen A., filed a formal petition for custody of the child. The child's mother, Ms. N., who herself suffers from a life-threatening disease, became progressively ill. Because of delays in producing Mr. A. from prison, absences of the mother due to her illness, and also absences of counsel, the hearing of this paternity proceeding has become protracted. During this time, Mr. Na. continued to care for Felicity.
TESTIMONY AT THE PATERNITY HEARING
The following facts are undisputed: Felicity N. was born on May 7, 2002 at the home of Sharon N. Neither Fidel A. nor Wayne Na. were present at the child's birth, although they each visited the next day. Felicity N. remained in the care and custody of her mother until the remand to ACS on February 6, 2004 under the Article 10 case. On March 12, 2004 Wayne Na. and Sharon N. executed an Acknowledgment of Paternity, and on March 31, 2004, this Court paroled Felicity N. to Wayne Na.
What is in dispute in the testimony taken is the role that both Fidel A. and Wayne Na. played in Felicity's life prior to March 31, 2004, the day Felicity was paroled to Wayne Na.
The Petitioner's first witness was Melissa A., Fidel A.'s sister. She testified that she first met Felicity when Felicity was ten months old, because there had been a question regarding Felicity's paternity. Ms. A. testified that she would see Felicity about twice a month, and celebrated some holidays in 2003 with her. However, she did not visit Felicity in the hospital [*4]nor did she tell her brother Fidel that Felicity was hospitalized. Ms. A. testified that Felicity called her brother "daddy". During Melissa's testimony, family photographs of Felicity were entered in to evidence, as was a videotape of an A. family party that Felicity and Sharon N. attended (Fidel was not there because he was incarcerated at the time).
Fidel A. testified that he met Sharon N. in 2001 when he was doing plumbing work in her apartment, and they began a sexual relationship. While he would frequently stay at her apartment, they did not live together, because as he put it "but me and her never had a stable relationship". Mr. A. testified that Ms. N. notified him of her pregnancy in August or September 2001 and that he stayed in her apartment on and off during her pregnancy because she lived on the construction site where he was working, making it more convenient for him to go to and from work.
On May 7, 2002, the day that Felicity was born, Ms. N. phoned Mr. A. and asked him if he would like to be there for the birth, but he got disconnected and didn't know where she was. Ms. N. called him the next day, May 8, 2002, and he came over to her home. He testified that he observed that Felicity "still had the placenta attached", i.e. that the umbilical cord was attached to the placenta and the placenta was in a purple Crown Royal liquor bag that Ms. N. saved and showed to him. At first Ms. N. told him the child was born in a hospital but then would not tell him where she gave birth. Consequently, Mr. A. was concerned about these bizarre circumstances, and the next day he called the police to report the situation and bring EMS workers to the home. Because of this call to the police, Ms. N. would not speak to him for the first three months of Felicity's life.
When Felicity was approximately three months old, Mr. A. ran into Ms. N. on the street and became reacquainted. He started coming over "doing what I can" for Felicity. He testified that he fed, bathed and changed her and that Felicity called him "da-da". Mr. A. testified that he was annoyed that Mr. Na. was coming by and "interacting" with Felicity because he told Ms. N. it would confuse Felicity. Ms. N. told him not to worry about it. Mr. A. further testified that Ms. N. was "telling me one thing and doing the opposite, and telling Mr. Na. other things". He also testified that Ms. N. would tell him "you are not Felicity's father anyway, so you need to go away", and she also told him to get a paternity test. He would ask about his paternity and the child's birth certificate and social security number, and she would argue or avoid the topic. Mr. A. testified that sometimes he would question whether he was Felicity's father, because Mr. Na. would come over to Ms. N.'s apartment.
Mr. A. claimed that he didn't introduce Felicity to his family until she was about 9 or 10 months old because of the problems with Ms. N., alluding to the paternity issue. His mother advised him to get a paternity test. Mr. A. bought Felicity a cake and earrings for her first birthday, and took Felicity to see his mother.
In July 2003 Mr. A. was arrested. Ms. N. posted bail for him, and thereafter Mr. A. stayed with Ms. N. until September 2003. In testifying about this time period, Mr. A. told how he would take Felicity to visit his friends and his mother. However, if Ms. N. was upset with [*5]him, she would tell him at times that he wasn't Felicity's father. Later, when he wasn't staying at Ms. N.'s apartment, he would see Felicity at least once per week.
Mr. A. recalled last speaking with Ms. N. sometime subsequent to Thanksgiving 2003, and then Ms. N. would no longer take his calls. Mr. A. testified that he decided to leave Ms. N. alone, he wanted to bring her to Court, but he knew he was going to jail in January 2004. Mr. A. was incarcerated from January 2004 to September 2004, and Ms. N. in most instances would not accept his calls. However, when he called in June 2004, Ms. N. told him ACS took her children away and that Felicity was with Wayne Na. Upon learning this, Mr. A. wrote his family a letter and then wrote to Family Court.
Fidel A.'s mother Carmen A. testified that she first met Ms. N. when she was pregnant, but did not see her again until Felicity was ten months old. Ms. A. gave no explanation why she waited all this time to see the baby. She testified that Felicity called her son daddy, and that she considered herself to be a grandmother. When Felicity was hospitalized, she visited Felicity occasionally at the hospital. However, she also testified that after Ms. N. told her at a later time that Fidel was not Felicity's father, Ms. A. was not sure whether she was the grandmother.
By the time of the paternity hearing, Ms. N. was supporting Fidel A.'s claims. Sharon N. testified that when she stated under oath in Court on February 19, 2004 at the 1028 hearing that Wayne Na. was Felicity's father, she did so under "duress, coercion and intimidation". She further testified that she had a brief relationship with Mr. Na. and they only lived together for six or seven months. Ms. N. testified that the head instructor at the martial arts school bought Felicity's crib but that Mr. Na. put it together. Ms. N. testified that she never told Mr. Na. he was the father although Mr. Na. came by a day or two after Felicity's birth. In her testimony, she downplayed her relationship with Mr. Na.
Wayne Na. was a bouncer in a nightclub and also worked as an instructor at a neighborhood martial arts school. He testified that he met Ms. N. in the summer of 1997 and after one date at the nightclub where he worked they began a sexual relationship. Mr. Na. moved in with her in November 1997, and they lived together through 2000. After he moved out, Mr. Na continued to have sexual relations with Ms. N. through the summer of 2001. He said Ms. N. called in July/August (or September at another point in his testimony), 2001, to tell him she was pregnant and that he was the father. Mr. Na. testified that he didn't want to move back in with Ms. N., but offered to help with expenses, and bought the crib, stroller, bath and other items. He testified that Ms. N. had been pregnant by him three other times, two of which ended in abortion and one miscarriage.
Mr. Na. testified that on May 6, 2002 he was walking in the street by Ms. N.'s house, and that she yelled out the window to him that her water broke. When he offered her assistance, she told him she didn't need his help, since she was going to call her sister. Ms. N. phoned Mr. Na. the next day, and when Mr. Na. inquired of visiting her in the hospital, Ms. N. indicated she would be home in the evening. Mr. Na. visited Ms. N. and the baby on that evening. He noticed the umbilical cord was still attached and the placenta was in a bag. He testified that Ms. N. told [*6]him it was because it was a "lotus birth".
Mr. Na. would see Felicity everyday after she was born until September 2002. Mr. Na. testified that his mother, his brothers and his aunts from Canada all came to see the baby in the spring of 2002, and that Ms. N. commented to Mr. Na.'s mother that the baby looked like Mr. Na. In late summer 2002, Ms. N. and Mr. Na. had a disagreement regarding whether Mr. Na. could take Felicity to his mother's, and the argument escalated into a physical altercation. Police were called, Mr. Na. was arrested, and an order of protection was issued against Mr. Na.
From September 2002 through December 2002, Mr. Na. moved to North Carolina and did not see Felicity. It was during this time that he learned that Ms. N. was involved with Fidel A. Mr. Na. returned to New York Christmas 2002, and Ms. N. brought Felicity to the door of her apartment for Mr. Na. to see her. Mr. Na. testified that commencing in January 2003 he began seeing Felicity two to three times a week at the martial arts center or Ms. N.'s apartment. He further testified that during one visit to see Felicity, Ms. N. was not home, but Mr. A. was. Mr. Na. announced that he was there to visit with Felicity, "his daughter", Mr. A. did not reply, and Mr. Na. went in to visit with Felicity. Mr. Na. testified that when the order of protection was lifted in May 2003, he began seeing Felicity daily. He threw her a first birthday party.
In January 2004, Mr. Na. went to Los Angeles, California to spend time with his sick father. While in California, he spoke with Ms. N. daily. Upon Mr. Na.'s return, he went to visit Felicity, and he observed that she looked seriously ill. Ms. N. indicated she hadn't taken Felicity to the doctor so Mr. Na. took Felicity to the Emergency Room at Westchester Square Hospital. Mr. Na. testified that Ms. N. identified him as the father at the hospital. Felicity was then transferred to St. Barnabas Hospital and ultimately to NY Presbyterian-Weil Cornell Medical Center. Mr. Na. testified that he visited Felicity daily, with the exception of three or four days when he was having difficulties with Ms. N. because she would not allow the doctors to treat the baby (this was the basis for the neglect case). Thereafter, Mr. Na. was at the hospital every day, including overnight at times, for the two months Felicity remained hospitalized. He believed she was dying, and he conferred with the doctors and nurses to participate in her care.
Mr. Na. testified that he believed he was Felicity's father when he signed the Acknowledgment of Paternity. Mr. Na. further testified that he never questioned his paternity until Mr. A.'s July 2004 letter to the Court.
The last witness to testify was Anna W., Ms. N.'s sister. Ms. W. testified that Ms. N. told her that Wayne Na. was the father, and that Ms. N. informed her that Mr. Na. bought things for the baby, including a crib, a stroller and a highchair. Ms. W. testified that at New York Presbyterian Hospital the doctors referred to Mr. Na. as Felicity's father, in front of Ms. N., and Ms. N. did not indicate otherwise, until one day when she was arguing with the doctors about Felicity's care. This was the first time Anna W. had ever heard that Mr. Na. may not be the father. However, shortly thereafter, when Felicity was ready for release, Ms. N. and Ms. W. met with ACS and Ms. N. offered Mr. Na., referring to him as Felicity's father, as a resource.
As to the time subsequent to the March 31, 2004 parole to Mr. Na., both Mr. Na. and Ms. [*7]Anna W. testified. Mr. Na. testified that upon Felicity's parole to his care, he would administer her numerous medications, replace the tube inserted from her nose to her stomach, tend to her when she would awake in the middle of the night, as well as participate in her speech and physical therapy sessions. Mr. Na. testified that Felicity saw his family three to four times a week, and that she referred to his brothers as "uncle", his mother as "Grandma" and his brothers' children as "cousins". Mr. Na. was able to recite all of the medications, including the dosages of each that she takes daily. Ms. W. testified that Felicity talks about Mr. Na. and refers to him as her dad.
I observed the demeanor of the witnesses during their testimony, and I find that each witness, except Sharon N., testified truthfully. Ms. N. behaved erratically while testifying in 2006, and her 2006 testimony contradicted statements she made under oath in 2004, a period when she was more lucid. Moreover, her statement that she was under "duress, coercion and intimidation" upon executing the Acknowledgment of Paternity was not backed up by any underlying factual support. Accordingly, I do not credit any of Ms. N.'s 2006 statements on the witness stand.
The credible testimony of the other witnesses, taken together, weaves a coherent narrative of the nuanced circumstances which form the basis for these competing claims of paternity.
DISCUSSION
Biology is not the sole determinative factor of parenthood. The law of this State recognizes that there are circumstances in which for the sake of the child a non-biological father should be recognized legally as the parent. In the paternity field, the courts have developed the concept of "equitable estoppel" to govern situations where, in the best interests of the child, a non-biological father may be declared the father. (See., e.g., Matter of Shondel J. v. Mark D., 7 NY3d 320; Matter of Ettore I. v. Angela D., 127 AD2d 6). Initially, the doctrine was utilized to prevent one from denying paternity after previously claiming or acquiescing in it, but as the law developed, it has been applied in a variety of factual and procedural settings. (Id.) Courts are more inclined to impose equitable estoppel to protect the status of a child in an already recognized and operative parent-child relationship. (Lorie F. v. Raymond F., 239 AD2d 659, citing Matter of Baby Boy C., 84 NY2d 91, 102 n.1). The overarching purpose of the law is to promote the best interests of the child. (E.g., John Robert P. v. Vito C., 23 AD3d 659; Jean Maby H. v. Joseph H., 246 AD2d 282).
The doctrine of equitable estoppel "may be invoked where the failure to promptly assert a right has given rise to circumstances rendering it inequitable to permit the exercise of the right after a lapse of time". (Ettore I. v. Angela D., supra, at p. 12). Once there is a requisite showing of operative facts to support an estoppel, the burden shifts to the other party to show why there should not be an estoppel in the best interests of the child. (Sharon GG v. Duane HH, 95 AD2d 466 affd 63 NY2d 859).
[*8]
Preliminarily, I note that I inadvertently made a procedural error by ordering the DNA test in October 2004 prior to determining the issue of equitable estoppel. However, this error does not preclude the Court "from determining the merits of the paternity issue". (Mancinelli v. Mancinelli, 203 AD2d 634, 636; see also Richard W. v. Roberta Y., 240 AD2d 812, 814). Even where blood tests exclude a man as the biological father, equitable estoppel can be applied to protect the father-child relationship. (Wilfredo V. v. Elena G., 167 Misc 2d 864).
Here, at the outset of Felicity's life, Sharon N. was less than forthcoming to these two men regarding the paternity of her child and created the uncertainty that has brought us to this stage. Notwithstanding this uncertainty, Wayne Na. never questioned his status as Felicity's father until Mr. A. sent a letter to this Court in July 2004. On the other hand, Mr. A. did question his status as Felicity's father, long before he filed this paternity petition. Mr. A.'s testimony clearly established that he questioned his paternity, prior to his January 2004 incarceration, based upon Ms. N.'s representations that he wasn't Felicity's father, her assertions that he should take a paternity test, his own mother's desire that he should take a paternity test, as well as Mr. A.'s own concerns regarding Mr. Na.'s visits with Felicity. However, he waited until Felicity was over two years old to file a paternity petition. Mr. A. testified that he waited to go to Court regarding paternity because he knew that he was going to jail in January 2004. This Court finds Mr. A.'s testimony unconvincing, particularly in light of the fact that Mr. A. did in fact file his paternity petition while incarcerated.
By the time Mr. A. filed the paternity petition, Felicity had been in Wayne Na.'s sole care for almost four months. Additionally, Mr. A., at the time he filed his paternity petition, in light of his incarceration, was not in a position to assume custody of Felicity, nor did he present himself, but rather his parents, as a resource upon his intended release from prison.
Sharon N. further developed the father-child relationship between Mr. Na. and Felicity, by acknowledging Mr. Na. as the father upon the child's admission to the hospital, signing the formal Acknowledgment of Paternity, and presenting Mr. Na. to ACS and the Court as Felicity's father during the child neglect case. Together with these actions by Ms. N., Mr. A.'s delay in proceeding to establish paternity when he first questioned it "indirectly promoted" the growth of the parent-child bond between Mr. Na. and Felicity.
Furthermore, during the course of this lengthy hearing, Felicity continued to be in Wayne Na.'s care, which now totals over three years. Felicity has been with Mr. Na. since March 2004, before she was even two years old. During this entire time period, Mr. Na. has carried out all of the traditional responsibilities of a father. Even more so, he has assumed the intensive and intimate responsibilities that go along with caring for a child with a life-threatening illness. When the results of the DNA test were made known, it did not alter Mr. Na.'s bond to Felicity; if anything, it only strengthened his commitment. The Court, in Ettore I. v. Angela D., supra at p. 15, held that in reflecting "upon the emotional fragility of a child of such tender age, and the child's need for continuity, we would be remiss if we failed to note that the inevitable effect of destroying the child's image of her family would be catastrophic and fraught with lasting trauma". The Ettore I. Court also noted the difficulty of substituting a new father for [*9]someone who "as a consequence of years of concern and love for a child, has become the psychological parent'" (Id.). Notwithstanding blood tests excluding Mr. Na. as the biological father, the disruption of the child's close relationship with the man she has known and loved as a father, and who has nursed her back to health, should not be countenanced. (see e.g., Matter of Enrique G. v. Lisbet E., 2 AD3d 288, 289). The desirability that a child know its true biological father, is not, alone, sufficient to defeat an estoppel defense. (see Sharon GG v. Duane HH, supra).
The following apt reflection was made in a case where the estoppel issue was raised in another context, but the reasoning is relevant and persuasive here. The paramount concern of "equitable estoppel" is fairness and justice "to ensure that adequate provision will be made for the child's needs.... If the child's best interests are to be the touchstone of the analysis...it is neither petitioner's nor respondent's feelings of aggrievement that are the determinative consideration". (Thomas S. v. Robin Y., 209 AD2d 298, 313-4, Ellerin J., dissenting).
Felicity N. views Wayne Na. as her father, and she has had no contact with Fidel A. since she was approximately twenty months old (except for one visit arranged independently by Mr. Na.). After Felicity's removal from Ms. N., Wayne Na.'s home is the only home Felicity has known. Felicity views Mr. Na. as her father, and his family members as her extended family. Felicity has already been removed from her mother's home due to neglect, and to remove her from what she views as her father's home would only have a detrimental impact. Wayne Na. has demonstrated by his intensive commitment to Felicity that he will continue to provide for the child's upbringing and many needs.
Accordingly, this Court finds that Wayne Na. has made out a prima facie case for equitable estoppel, and Fidel A. has failed to establish why estoppel should not be applied in Felicity's best interest. Consequently, Wayne Na.'s motion is granted, and Fidel A.'s paternity petition is dismissed.
Dated:June 14, 2007
Footnotes

Footnote 1: The petition also alleged claims of neglect as to two older siblings, who have different fathers and who are not the subject of the paternity claims here at issue.